1   DANIEL J. THOMASCH
(Admitted *Pro Hac Vice*)
dthomasch@gibsondunn.com
2   LAUREN J. ELLIOT
(Admitted *Pro Hac Vice*)
3   lelliot@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
4   200 Park Avenue
New York, New York  10166-0193
5   Telephone:   212.351.4000
Facsimile:    212.351.4035
6

NORMAN C. HILE, SBN 27599
nhile@orrick.com
JULIE A. TOTTEN, SBN 166470
jatotten@orrick.com
DAVID A. PRAHL, SBN 233583
dprahl@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California  95814-4497
Telephone: 916.447.9200
Facsimile:  916.329.4900

7   JULIAN W. POON, SBN 219843
 jpoon@gibsondunn.com
8   ALEXANDER K. MIRCHEFF, SBN 245074
amircheff@gibsondunn.com
9   GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
10  Los Angeles, California  90071-3197
Telephone:   213.229.7000
11  Facsimile:    213.229.7520

MICHELE L. MARYOTT, SBN 191993
mmaryott@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, California  92612-4412
Telephone:  949.451.3800
Facsimile:  949.451.4220

12  Attorneys for Defendant
PRICEWATERHOUSECOOPERS LLP
13

14

15                      UNITED STATES DISTRICT COURT

16                      EASTERN DISTRICT OF CALIFORNIA

17

18  SAMUEL BRANDON KRESS, LAC ANH
LE, JASON PATTERSON, LAUREN SAN
19  MATEO, JAMES STEKELBERG, DANA
BLINDBURY, JESSE KENNY, KELLY C.
20  JONES, ANTOINE POWELL, ALBERT LIU,
DANIEL GONZALEZ, and DAVID
21  BEADLES, on behalf of themselves and all
others similarly situated,
22

23          Plaintiffs,

24       v.

25  PRICEWATERHOUSECOOPERS LLP,

26          Defendant.

CASE NO.: 2:08-cv-00965 LKK/GGH

**MEMORANDUM OF POINTS AND
AUTHORITIES OF
PRICEWATERHOUSECOOPERS LLP
IN OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS
CERTIFICATION**

Date:    March 26, 2012
Time:   10:00 a.m.
Courtroom 4
Judge Lawrence K. Karlton

27

28

# **TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT ............................................................................... 1

II. THE LEGAL STANDARD ................................................................................ 5

III. ARGUMENT .................................................................................................. 8

    A.    Plaintiffs Fail to Establish Commonality or Predominance Because Their Misclassification Claims Would Require Individualized Inquiries into What Each Senior Associate Actually Does During any Given Week.................................. 8

        1.    Class-Wide Proof Cannot Resolve Whether Plaintiffs Are Primarily Engaged in Work Requiring Discretion and Independent Judgment (Contention 9). ............................................... 12

            a.    The Nature and Degree of Discretion Exercised by Different Senior Associates Vary Substantially. .................................. 12

            b.    Plaintiffs Cannot Obfuscate the Differences in Judgment and Discretion Exercised by Putative Class Members. ............................ 17

        2.    Common Proof Cannot Resolve the Remaining Elements of the Administrative Exemption. ................................................ 24

            a.    Whether Senior Associates Work Under More than General Supervision (Contention 7) ............................... 24

            b.    Whether Senior Associates Are Primarily Engaged in Work Directly Related to the Management Policies or General Business Operations of PwC or Its Clients (Contention 6)............... 27

            c.    This Court Has Already Rejected Plaintiffs' Other Contentions Regarding the Administrative Exemption (Contentions 5 and 8)...... 32

        3.    The Remaining Elements of the Professional Exemption Cannot Be Resolved "In One Stroke," Notwithstanding Plaintiffs' Erroneous Assertions of Law. .......................................................... 33

            a.    Cal. Bus. & Prof. Code § 5053 (Contention 4) .................... 33

            b.    Whether Senior Associates Are Primarily Engaged in an Occupation That Is Commonly Recognized As a Learned Profession (Contention 2) ..................................... 34

            c.    Work Requiring Knowledge of an Advanced Type (Contentions 1 and 3)............................................................... 36

        4.    Common Issues Do Not Exist, Much Less Predominate. .............................. 44

i

Gibson, Dunn &
Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B.      Common Issues Do Not Exist, Nor Predominate, With Respect to Plaintiffs'
        Meal-Period and Rest-Break Claims.........................................................................45

C.      Plaintiffs Are Neither Typical Nor Adequate Class Representatives. .......................46

D.      Class Adjudication Would Neither Be Manageable, Superior to Individual
        Actions, Nor Consistent with PwC's Basic Due Process Rights. .............................48

IV. CONCLUSION.........................................................................................................................49

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aburto v. Verizon Cal., Inc.,*
2012 U.S. Dist. LEXIS 329 (C.D. Cal. Jan. 3, 2012) ...................................... 11

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ........................................................................... 6, 7, 48

*Benny v. United States Parole Comm'n,*
295 F.3d 977 (9th Cir. 2002) ........................................................................ 40

*Bledea v. Indymac Bank,*
2010 U.S. Dist. LEXIS 23391 (E.D. Cal. Feb. 25, 2010) ........................... 49

*Bothell v. Phase Metrics, Inc.,*
299 F.3d 1120 (9th Cir. 2002) ............................................................. 30, 32

*Bourjaily v. United States,*
483 U.S. 171 (1987) ...................................................................................... 6

*Brady v. Deloitte & Touche LLP,*
2010 WL 1200045 (N.D. Cal. Mar. 23, 2010) .......................................... 11

*Brinker v. Superior Court,*
S166350 (Cal. 2011) .................................................................................... 45

*Brown v. Fed. Exp. Corp.,*
249 F.R.D. 580 (C.D. Cal. 2008) ............................................................... 45

*Campbell v. PricewaterhouseCoopers LLP,*
642 F.3d 820 (9th Cir. 2011) ............................................................. passim

*Campbell v. PricewaterhouseCoopers LLP,*
No. S-06-2376 LKK (E.D. Cal. Feb. 20, 2009) ....................................... 43

*Campbell v. Pricewaterhousecoopers, LLP,*
253 F.R.D. 586 (E.D. Cal. 2008) ........................................................ passim

*Campbell v. PricewaterhouseCoopers, LLP,*
602 F. Supp. 2d 1163 (E.D. Cal. 2009) .................................................... 30

*Combs v. Skyriver Commc'ns, Inc.,*
159 Cal. App. 4th 1242 (2008) ................................................. 17, 27, 32

*Coopers & Lybrand v. Livesay,*
437 U.S. 463 (1978) ...................................................................................... 5

*Cruz v. Dollar Tree Stores, Inc.,*
2011 WL 2682967 (N.D. Cal. July 8, 2011) ...................................... passim

Gibson, Dunn & Crutcher LLP

*Dingwall v. Friedman Fisher Assocs., P.C.*,
   3 F. Supp. 2d 215 (N.D.N.Y. 1998) ................................................................. 33

*Drake v. Morgan Stanley & Co., Inc.*,
   2010 WL 2175819 (C.D. Cal. Apr. 30, 2010) ....................................... 11, 46, 48, 49

*Dukes v. Wal-Mart Stores, Inc.*,
   603 F.3d 571 (9th Cir. 2010) .......................................................................... 11

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) .................................................................... passim

*Evans v. IAC/Interactive Corp.*,
   244 F.R.D. 568 (C.D. Cal. 2007) ............................................................ 4, 46, 49

*Fetrow-Fix v. Harrah's Entm't, Inc.*,
   2011 U.S. Dist. LEXIS 133696 (D. Nev. Nov. 16, 2011) ......................................... 30

*Galvan v. KDI Distrib.*,
   2011 WL 5116585 (C.D. Cal. Oct. 25, 2011) ..................................................... 49

*Garcia v. Sun Pac. Farming Coop.*,
   2008 U.S. Dist. LEXIS 111969 (E.D. Cal. May 14, 2008) ..................................... 7, 49

*Harris v. Superior Court*,
   --- Cal. 4th ----, 2011 WL 6823963 (Dec. 29, 2011) ........................................ 32, 33

*Heffelfinger v. Elec. Data Sys. Corp.*,
   580 F. Supp. 2d 933 (C.D. Cal. 2008) ...................................................... 17, 27, 33

*Hill v. R+L Carriers*,
   2011 U.S. Dist. LEXIS 27997 (N.D. Cal. Mar. 3, 2011) .......................................... 31

*Hills v. Western Paper Co.*,
   825 F. Supp. 936 (D. Kan. 1993) ..................................................................... 30

*Ho v. Ernst & Young*,
   2011 WL 4403625 (N.D. Cal. Sept. 20, 2011) ...................................................... 11

*Ho v. Ernst & Young, LLP*,
   2011 U.S. Dist. LEXIS 106658 (N.D. Cal. Sept. 20, 2011) ........................................ 46

*Hughes v. WinCo Foods*,
   2012 U.S. Dist. LEXIS 2469 (C.D. Cal. Jan. 4, 2012) ............................................. 11

*In re Hotel Telephone Charges*,
   500 F.2d 86 (9th Cir. 1974) ........................................................................... 48

*In re Initial Pub. Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) .............................................................................. 6

*In re Paxil Litig.*,
   212 F.R.D. 539 (C.D. Cal. 2003) ...................................................................... 49

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   268 F.R.D. 604 (N.D. Cal. 2010) ....................................................................... 6

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
571 F.3d 953 (9th Cir. 2009) ................................................................. 2, 17

*Kelley v. SBC, Inc.*,
1998 U.S. Dist. LEXIS 18643 (N.D. Cal. Nov. 13, 1998) ......................... 46

*Kenny v. Supercuts, Inc.*,
252 F.R.D. 641 (N.D. Cal. 2008)............................................................. 45

*Lanzarone v. Guardsmark Holdings, Inc.*,
2006 WL 4393465 (C.D. Cal. Sept. 7, 2006) ......................................... 49

*Leslie v. Ingalls Shipbuilding, Inc.*,
899 F. Supp. 1578 (S.D. Miss. 1995) ...................................................... 41

*Litchfield v. KPMG LLP*,
No. 07-2-11179-4 (Wash. Super. Ct. Nov. 25, 2009).............................. 11

*Lott v. Howard Wilson Chrysler-Plymouth, Inc.*,
203 F.3d 326 (5th Cir. 2000) ................................................................. 30

*Marlo v. United Parcel Serv., Inc.*,
251 F.R.D. 476 (C.D. Cal. 2008).............................................................. 8

*Marlo v. United Parcel Serv., Inc.*,
639 F.3d 942 (9th Cir. 2011) ........................................................ passim

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................... 6

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008), *partially abrogated by Bridge v. Phoenix Bond &
Indem. Co.*, 553 U.S. 639 (2008)............................................................ 48

*Medepalli v. Maximus, Inc.*,
2008 WL 958045 (E.D. Cal. Apr. 8, 2008) ............................................ 36

*Mekhitarian v. Deloitte & Touche (ICS), LLC*,
2009 WL 6057248 (C.D. Cal. Nov. 3, 2009) ..................................... passim

*Morse v. Marie Callender Pie Shop, Inc.*,
2011 U.S. Dist. LEXIS 50920 (S.D. Cal. May 12, 2011).......................... 7, 44

*Nguyen v. BDO Seidman, LLP*,
2009 U.S. Dist. LEXIS 97524 (C.D. Cal. July 6, 2009) ...................... passim

*Novak v. The Boeing Co.*,
2011 U.S. Dist. LEXIS 146676 (C.D. Cal. Dec. 19, 2011) ................. passim

*Piscione v. Ernst & Young L.L.P.*,
171 F.3d 527 (7th Cir. 1999) ............................................................ 15, 23

*Pryor v. Aerotek Scientific, LLC*,
2011 U.S. Dist. LEXIS 150276 (C.D. Cal. Nov. 15, 2011)....................... 7, 44

Gibson, Dunn &
Crutcher LLP

*Ramirez v. Yosemite Water Co.*,
  20 Cal. 4th 785 (1999) ................................................................. 21

*Ryman v. Sears, Roebuck & Co.*,
  505 F.3d 993 (9th Cir. 2007) ........................................................ 10

*Soderstedt v. CBIZ S. Cal.*,
  197 Cal. App. 4th 133 (2011) ................................................. passim

*Solis v. State of Washington, Dep't of Soc. & Health Servs.*,
  656 F.3d 1079 (9th Cir. Sept. 9, 2011) ........................................ 40

*Sweet v. Pfizer, Inc.*,
  232 F.R.D. 360 (C.D. Cal. 2005) ................................................. 49

*United Parcel Service Wage & Hour Cases*,
  190 Cal. App. 4th 1001 (2010) ................................... 29, 30, 32

*United States v. Uptergrove*,
  2008 U.S. Dist. LEXIS 101952 (E.D. Cal. Dec. 17, 2008) ......... 49

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009) ................................................... 49

*Velazquez v. Costco Wholesale Corp.*,
  2011 WL 4891027 (C.D. Cal. Oct. 11, 2011) ........................ passim

*Vinole v. Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009) ....................................................... 17

*Wachtel v. Guardian Life Ins. Co.*,
  453 F.3d 179 (3d Cir. 2006) .................................................... 4, 49

*Wagner v. Lehman Bros. Kuhn Loeb, Inc.*,
  646 F. Supp. 643 (N.D. Ill. 1986) ........................................ 47, 48

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ............................................................ passim

*Wang v. Chinese Daily News, Inc.*,
  231 F.R.D 602 (C.D. Cal. 2005) ................................................. 46

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
  208 F.3d 288 (1st Cir. 2000) ......................................................... 7

*Webster v. Pub. Sch. Employees of Wash., Inc.*,
  247 F.3d 910 (9th Cir. 2001) ....................................................... 33

*White v. Starbucks Corp.*,
  497 F. Supp. 2d 1080 (N.D. Cal. 2007) ...................................... 45

*Whiteway v. Fedex Kinkos Office & Print Servs., Inc.*,
  2009 U.S. Dist. LEXIS 127360 (N.D. Cal. Sept. 29, 2009) .......... 8

Gibson, Dunn &
Crutcher LLP

Case No. 2:08-cv-00965 – LKK/GGH
DEFENDANT'S MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION

*Wong v. AT&T Mobility Servs. LLC*,
  2011 U.S. Dist. LEXIS 125988 (C.D. Cal. Oct. 20, 2011), *adopted as final ruling*
  *by* 2011 U.S. Dist. LEXIS 125996 (C.D. Cal. Oct. 21, 2011) ................................. passim

*Wren v. RGIS Inventory Specialists*,
  256 F.R.D. 190 (N.D. Cal. 2009) ......................................................................... 45

*Zelasko-Barrett v. Brayton-Purcell, LLP*,
  198 Cal. App. 4th 582 (2011) .............................................................................. 23

*Zinser v. Accufix Research Inst.*,
  253 F.3d 1180 (9th Cir. 2001) ........................................................................ 5, 49

**Statutes**

28 U.S.C. § 2072(b) .......................................................................................... 48

**Rules**

Fed. R. Civ. P. 23(b)(3) ....................................................................................... 6

Fed. R. Civ. P. 23(c)(1)(A), Advisory Comm. Note ............................................. 49

Fed. R. Evid. 104(a) ............................................................................................. 6

**Regulations**

29 C.F.R. § 541.201(b) (2004) ............................................................................ 27

29 C.F.R. § 541.202(c) ........................................................................................ 23

29 C.F.R. § 541.205(c)(1) (2001) ........................................................................ 27

29 C.F.R. § 541.207 (2001) ................................................................................. 20

29 C.F.R. § 541.207(e)(1) (2001) ................................................................... 24, 34

29 C.F.R. § 541.301 ............................................................................................ 40

29 C.F.R. § 541.301(b) (2001) ............................................................................ 43

29 C.F.R. § 541.301(d) (2001) ............................................................................ 43

29 C.F.R. § 541.301(e)(5) (2004) ........................................................................ 42

29 C.F.R. § 541.308(a) (2001) ............................................................................ 17

29 C.F.R. § 541.704 (2004) ................................................................................. 18

29 C.F.R. 541.306(a) (2001) ............................................................................... 36

Cal. Code Regs. tit. 16, § 9.2(b) ......................................................................... 41

Cal. Code Regs. tit. 8, § 11040(1)(A) .................................................................. 45

Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(f) ...................................................... 7, 27

vii

Cal. Code Regs. tit. 8, § 11040(1)(A)(3) ................................................................ 37

Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(b) ........................................................... 37

Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(b)(i) ........................................... 35, 37, 38

Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(b)(iii) ............................................. 35, 36

Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(e) ................................................... 17, 41

Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(i) ............................................................ 41

**Other Authorities**

69 Fed. Reg. 22,122, 22,151 (April 23, 2004) ..................................................... 41

Cal. Bd. of Accountancy, Uniform CPA Examination Handbook 4 (2011) ........................................ 41

Dept. of Industrial Relations, DLSE Opinion Letter 2003.05.23 ............................................. 30

Gibson, Dunn &
Crutcher LLP

Case No. 2:08-cv-00965 – LKK/GGH
DEFENDANT'S MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION

# I.  PRELIMINARY STATEMENT

Though Plaintiffs recite a litany of purportedly common questions, none of them is capable of generating "common answers apt to drive resolution of the litigation" on a class-wide basis.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  What will drive the litigation are the myriad individualized inquiries comprising the "crucial touchstone" of Plaintiffs' employment misclassification claims—each "employee's actual job duties and responsibilities."  *Campbell v. PricewaterhouseCoopers LLP*, 642 F.3d 820, 830 (9th Cir. 2011).  The trial of the exemption questions presented here cannot be limited to evidence such as PwC's policies, the rules of professional conduct for auditors, or any other purportedly common means of proof.  Even if Plaintiffs opt to rely exclusively on such evidence at trial, PwC is entitled to present its defense, and that defense is centered on the differing actual duties of 2,077 class members, working from six separate offices, on behalf of thousands of separate clients, in the performance of tens of thousands of separate audits during the class period.  And, as reflected by no fewer than 22 declarations that PwC has submitted, Senior Associates regularly exercise discretion in numerous and varied contexts, thus eviscerating the notion that PwC's policies could constitute class-wide proof to the contrary.

Whether the defects in Plaintiffs' request for certification are analyzed under the rubric of commonality or predominance, Plaintiffs have failed to carry their burden of proof under Federal Rule of Civil Procedure 23, because they have failed to establish that *either* the professional or the administrative exemption can properly be adjudicated through common proof—much less that *both* of them can be—as is Plaintiffs' "burden" in "seeking class certification."  *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).  If even one of PwC's defenses is not amenable to class treatment—and both of them are not—it necessarily follows that Plaintiffs' misclassification claims cannot be tried as a class, because PwC is "*entitled* to litigate its . . . defenses," as the Supreme Court unanimously held in *Wal-Mart*, 131 S. Ct. at 2561 (emphasis added).  Nor have Plaintiffs offered any indication of what trial plan could possibly render such individualized inquiries manageable in a way that could come close to protecting PwC's basic rights to due process.

Plaintiffs' purportedly common contentions suffer from numerous fundamental defects:

*Plaintiffs' contentions cannot be resolved "in one stroke" through common proof.*  Plaintiffs

strain to avoid any inquiry into actual job duties and responsibilities because, as the Ninth Circuit

recognized, these matters are a "veritable hotbed" of "factual disputes." *Campbell*, 642 F.3d at 828.

Plaintiffs simply ignore numerous holdings from the Ninth Circuit that misclassification claims

require an "intensely factual" inquiry into what employees "*actually*" do "*in any given workweek*,"

which "militate[s] against certification." *E.g.*, *Marlo*, 639 F.3d at 948 (emphasis added); *In re Wells*

*Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009); *Campbell*, 642 F.3d

at 827.  Thus, the actual work experiences of Senior Associates are highly material to the

applicability of both the administrative and professional exemptions.

 *First*, it is readily apparent that Senior Associates exercise substantial and varying levels and

kinds of discretion and independent judgment as to matters of importance.  PwC is entitled to

establish that material fact by individualized proof of the varied duties and responsibilities of

different associates involved in different industries, engagements, and audit tasks.  In fact, Senior

Associates are involved in providing Attest services for clients across at least *17* different industries

or sectors, each of which involve different accounting principles, which in turn call for different audit

techniques.  The variation among the duties and responsibilities of Senior Associates on a week-to-

week basis is readily evident from the testimony of just 1% of the putative class who have submitted

declarations on PwC's behalf.  It is only reasonable to assume that the entire putative class reflects

exponentially greater variation.  That reality is inherently inconsistent with class treatment.

 *Second*, Senior Associates are subject to markedly varying degrees of supervision that can

only be assessed by inherently individualized inquiries, notwithstanding Plaintiffs' reliance on PwC's

policies.  Mot. at 9-10.  Indeed, it cannot be disputed that many (if not all) Senior Associates have

substantial supervisory responsibilities over Associates and even other Senior Associates, including

assuming the Manager's role on some engagements.  On a day-to-day basis, some Senior Associates

may be the senior members of the audit team on-site.  Some seasoned members of Plaintiffs' putative

class have supervised and reviewed other less-experienced members—an activity that requires

numerous judgment calls—thus underscoring the dramatic variation in both discretion and degree of

supervision across the thousands of individuals in Plaintiffs' proposed class.  *See, e.g.*, Poon Decl.

Ex. 2[1] [Adams Decl.] ¶ 19 ("[W]hereas the other Senior Associate on [my] engagement spent almost the entirety of his time performing audit testing work *that I had assigned to him*, I spent most of my time performing audit management duties.  This in turn required that I apply my accounting knowledge and use my judgment in drastically different ways.") (emphasis added).

Therefore, as was true in another recent wage-and-hour case, "[i]t is clear . . . that [putative class members] perform different amounts of exempt and non-exempt duties, have different levels of supervision, employ different amounts of independent judgment and discretion, . . . and have . . . different educational backgrounds.  This indicates that for all of these aspects of the exemptions, the Court would have to engage in individualized rather than common inquiry."  *Novak v. The Boeing Co.*, 2011 U.S. Dist. LEXIS 146676, at *14 (C.D. Cal. Dec. 19, 2011).

*Many of Plaintiffs' key contentions rest on fundamental misapprehensions of law.*  Plaintiffs also ignore the Ninth Circuit's recent holding that PwC's Attest Associates—junior to the Senior Associates at issue in this case—"are not categorically ineligible" for the administrative and professional exemptions, but will or will not qualify for exemption depending on the actual work performed by each such individual.  *Campbell*, 642 F.3d at 830.  Plaintiffs attempt to evade this holding by arguing for the same sorts of categorical bars to exemption that the Ninth Circuit rejected.  Mot. at 19.  For example, although *Campbell* explicitly rejected the contention that Attest Associates were categorically non-exempt  by virtue of professional (*e.g.*, AICPA) standards, or under California Business and Professions Code § 5053, Plaintiffs repackage that rejected contention here.  Mot. at 19.  Similarly, Plaintiffs' contentions concerning educational prerequisites would also fail under the requisite "rigorous analysis" because they are also unsupported by either the law or the facts.  *E.g.*, *Wal-Mart*, 131 S. Ct. at 2551; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

*Class adjudication is neither superior nor manageable, and would be fundamentally inconsistent with PwC's right to Due Process*.  Plaintiffs also cannot establish that class treatment would be superior to individual actions, or that this Court can adjudicate the individual issues in a

---

[1] "Ex. #" and "Ex. S#" refer to exhibits to the Declarations of Julian W. Poon and Michele L. Maryott, respectively.  PwC has sought leave to file the Maryott Declaration under seal because the exhibits thereto constitute confidential and proprietary materials of PwC and its employees.

Gibson, Dunn & Crutcher LLP

trial that both is manageable and protects the parties' basic substantive and procedural rights.  Fairly adjudicating Plaintiffs' misclassification, meal-period, and rest-break claims would necessitate asking every individual class member what they actually did on a week-to-week basis—which will vary from associate to associate and engagement to engagement—and whether PwC actually failed to provide and instead *prevented* each of them from taking each of their meal and rest breaks.  *See, e.g., Wong v. AT&T Mobility Servs. LLC*, 2011 U.S. Dist. LEXIS 125988, at *14, 16-17 & n.11 (C.D. Cal. Oct. 20, 2011), *adopted as final ruling by* 2011 U.S. Dist. LEXIS 125996 (C.D. Cal. Oct. 21, 2011).

Because Plaintiffs lack any "common evidence to support extrapolation" from the "individual experiences" of the handful of putative class members who have filed declarations, any exemption determination based on extrapolations from "representative testimony" would amount to an impermissible "Trial by Formula" that would impermissibly "abridge" PwC's rights, prevent PwC from litigating individualized defenses to which it was "entitled" as a matter of due process, and result in "a class-wide judgment" that is "merely speculative."  *Wal-Mart*, 131 S. Ct. at 2559-61; *Cruz v. Dollar Tree Stores, Inc.*, 2011 WL 2682967, at *4, 7-8 (N.D. Cal. July 8, 2011).  There is no basis for inferring that the experiences of Plaintiffs' five Senior Associate witnesses apply across the entire putative class, particularly given that numerous other declarants have described vastly differing experiences.  *Novak*, 2011 U.S. Dist. LEXIS 146676, at *14-16.  Because there is no common, class-wide way to sort through the myriad factual disputes as to what any particular Senior Associate actually did in any given week, Plaintiffs' bare assurances of manageability—unaccompanied by a mandatory trial plan—do not satisfy the "'critical need . . . to determine how the case will be tried'" through a "full and clear articulation of the litigation's contours at the time of class certification."  *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 186 (3d Cir. 2006); *accord Evans v. IAC/Interactive Corp.*, 244 F.R.D. 568, 574 n.4 (C.D. Cal. 2007).

Ultimately, Plaintiffs' request for certification of a putative statewide class of Senior Associates rests on demonstrably incorrect legal contentions, and relies mainly on an infinitesimal number (five) of witnesses whose heavily disputed testimony cannot begin to describe the week-to-week duties and experiences of 2,077 different individuals.  Plaintiffs' motion should be denied.

Gibson, Dunn &
Crutcher LLP

Case No. 2:08-cv-00965 – LKK/GGH
DEFENDANT'S MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION

## II.  THE LEGAL STANDARD

As the "[p]arties seeking class certification," Plaintiffs "bear the burden of demonstrating that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a)"—numerosity, commonality, typicality, and adequacy of representation—"and at least one of the requirements of Rule 23(b)."  *Ellis*, 657 F.3d at 979–80.  "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart*, 131 S. Ct. at 2551.  And it is well established that, "[b]efore certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23."  *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

The Supreme Court recently clarified the contours of that "rigorous analysis" under Rule 23(a).  *See Wal-Mart*, 131 S. Ct. at 2550–51.  The Court explained that, to satisfy the commonality requirement, "the raising of common questions—even in droves—" is not enough.  *Id.* at 2551.  Instead, "[w]hat matters to class certification . . . [is] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.*  Thus, Plaintiffs' "claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 2551.

Often "that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim."  *Wal-Mart*, 131 S. Ct. at 2551.  That is because "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"  *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978).  As the Ninth Circuit recently emphasized, "a district court *must* consider the merits if they overlap with the Rule 23(a) requirements."  *Ellis*, 657 F.3d at 981 (emphasis added).  "Nor is there anything unusual about that consequence:  The necessity of touching aspects of the merits in order to resolve preliminary matters, *e.g.,* jurisdiction and venue, is a familiar feature of litigation."  *Wal-Mart*, 131 S. Ct. at 2552.  Making the preliminary findings of fact necessary to properly decide class certification will not affect the

ultimate merits (*e.g.*, liability) or the factfinder's findings as to same, and would in no way preclude any of the individual plaintiffs from pursuing, on an individual basis, their own claims for any overtime pay, statutory penalties, interest, and/or attorneys' fees to which they might be entitled.  *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 39 (2d Cir. 2006) ("A trial judge's finding on a merits issue for purposes of a Rule 23 requirement no more binds the court to rule for the plaintiff on the ultimate merits of that issue than does a finding that the plaintiff has shown a probability of success for purposes of a preliminary injunction.").[2]

In addition to establishing commonality, plaintiffs who seek to certify a class under Rule 23(b)(3) must demonstrate that common questions predominate over individual ones, and that a class action is the superior method of adjudication.  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry is even "more stringent" and "far more demanding" than Rule 23(a)'s commonality analysis.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997); *see also, e.g.*, *Novak*, U.S. Dist. LEXIS 146676, at *18 ("predominance is a more rigorous requirement than the Rule 23(a)(2) commonality prerequisite").  "The important inquiry is not whether common issues predominate with respect to plaintiff's prima facie case, but rather will common issues predominate in the entire litigation."  *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D. 604, 612 (N.D. Cal. 2010).  And where, as here, "the adjudication of a defense for which the defendant has the burden of proof would necessitate individual inquiries, and those inquiries would predominate . . .[,] certification should be denied."  *Id.*

For this reason, Plaintiffs fail to carry their class certification burden regardless of whether it is possible in this case to resolve, on a common, classwide basis, one or more elements of the administrative or professional exemptions, or even an element common to both exemptions.  That is

---

[2]  *See also, e.g.*, Fed. R. Evid. 104(a); *cf. Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (before admitting an (alleged) co-conspirator's statements as non-hearsay, the court must resolve the preliminary question whether there was a conspiracy, without obviously binding the factfinder as to the question of ultimate liability for conspiracy); *cf., e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (on a motion for summary judgment, the court must "'pierce the pleadings and . . . assess the proof in order to see whether there is a genuine need for trial'").

Gibson, Dunn & Crutcher LLP

  
because even if "element[s] of *each* exemption [could] be adjudicated through common proof on a class wide basis," the "question is not whether the putative class has at least one issue in common, but whether common 'questions of law or fact . . . *predominate* over any questions affecting only individual members.'" *Nguyen v. BDO Seidman, LLP*, 2009 U.S. Dist. LEXIS 97524, at *7 (C.D. Cal. July 6, 2009) (emphases added). *Wal-Mart* requires that plaintiffs raise common questions answerable through common proof that "*will resolve*"—not just that *might* resolve—"an issue that is central to the validity of each one of the[ir] claims in one stroke." 131 S. Ct. at 2551 (emphasis added). None of the supposedly common proof Plaintiffs point to here meets that standard.[3] Resolution of these issues cannot precede PwC's defense, and that defense is aimed, as the Wage Order states, at an employee-by-employee examination of "the work actually performed by the employee during the course of the workweek." Cal. Code Regs., tit. 8, § 11040(1)(A)(2)(f).

Importantly, the propriety of class certification must be reviewed in light of the substantive elements of Plaintiffs' claims. *E.g.*, *Amchem*, 521 U.S. at 621, 629; *Ellis*, 657 F.3d at 981; *Garcia v. Sun Pac. Farming Coop.*, 2008 U.S. Dist. LEXIS 111969, at *38 (E.D. Cal. May 14, 2008) (in ruling on certification, "the court must understand the claims, defenses, relevant facts and applicable substantive law").[4] Here, the Court must apply the governing legal standards articulated by the Ninth Circuit in the related *Campbell* matter, because "[o]nly by doing so can the Court determine whether Plaintiffs establish common issues that can be resolved class-wide." *Morse*, 2011 U.S. Dist. LEXIS 50920, at *8. The inquiry thus requires the Court to consider appellate precedent that has interpreted

---

[3]  *See, e.g.*, *Pryor v. Aerotek Scientific, LLC*, 2011 U.S. Dist. LEXIS 150276, at *48 (C.D. Cal. Nov. 15, 2011) ("[W]hile the policies about which Pryor complains are common . . . that does not answer the ultimate question in the case—whether Aerotek's time reporting policies resulted in the undercompensation of and failure to pay overtime to putative class members."); *Velazquez v. Costco Wholesale Corp.*, 2011 WL 4891027, at *5 (C.D. Cal. Oct. 11, 2011) ("[C]ommon resolution of whether . . . duties are largely exempt or nonexempt does not in and of itself dictate a finding that this issue predominates.").

[4]  Courts deciding whether plaintiffs have met the Rule 23 requirements "begin by looking at the underlying claims" and defenses to assess "what issues must be resolved at the merits stage" and "must formulate some prediction as to how specific issues will play out." *Morse v. Marie Callender Pie Shop, Inc.*, 2011 U.S. Dist. LEXIS 50920, at *7-8 (S.D. Cal. May 12, 2011); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000).

Gibson, Dunn &
Crutcher LLP

Case No. 2:08-cv-00965 – LKK/GGH
DEFENDANT'S MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION

1  the relevant legal rules, including, when appropriate, an intervening appellate opinion reversing a

2  grant of summary judgment, such as *Campbell*. *See, e.g.*, *Marlo v. United Parcel Serv., Inc.*, 251

3  F.R.D. 476, 479 (C.D. Cal. 2008) (decertifying class following Ninth Circuit's reversal of summary

4  judgment because district court was "increasingly concerned that individualized issues may

5  predominate over class-wide issues, and that as a result, Plaintiff's class may no longer satisfy the

6  Rule 23 requirements"); *Whiteway v. Fedex Kinkos Office & Print Servs., Inc.*, 2009 U.S. Dist.

7  LEXIS 127360 (N.D. Cal. Sept. 29, 2009) (same).

## III.  ARGUMENT

8

9  **A.    Plaintiffs Fail to Establish Commonality or Predominance Because Their Misclassification Claims Would Require Individualized Inquiries into What Each Senior Associate Actually Does During any Given Week.**

10

11          Plaintiffs have failed to carry their "burden . . . to demonstrate that Rule 23's class-

12  certification requirements [have] been met." *Marlo*, 639 F.3d at 947-48.  In contending they have,

13  Plaintiffs focus on purportedly common contentions concerning the professional exemption that

14  amount to the same sorts of categorical bars that *Campbell* rejected in holding that PwC Associates

15  are not "categorically ineligible, as a matter of law," for exemption.  642 F.3d at 822; Mot. at 2-3, 19.

16  But none of these quick fixes obviates the need for individualized inquiries concerning the "crucial

17  touchstone" of each "employee's actual job duties and responsibilities."  *Campbell*, 642 F.3d at 830.

18          Before refuting those arguments though, PwC will address Plaintiffs' purportedly common

19  contentions about job duties—that is, whether each of the estimated 2,077 class members exercised

20  "discretion and independent judgment" (as both the administrative and professional exemptions

21  require), and whether they worked under "only general supervision" and performed work "directly

22  related to the management policies or general business operations" of PwC or its clients (for purposes

23  of the administrative exemption).[5]  Far from driving resolution of this litigation, Plaintiffs'

24  contentions illustrate the variation and uneven texture across Plaintiffs' putative class of Senior

25

26

27  _____

28

Gibson, Dunn & Crutcher LLP

[5]  The Wage Order's relevant provisions are set forth at Poon Decl., Ex. 44.

Case No. 2:08-cv-00965 – LKK/GGH
DEFENDANT'S MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION

Associates in PwC's Attest Division,[6] and demonstrate that the trial of this action based on a handful of anecdotes, with no common evidence to support "extrapolation" to the rest of the putative class, *Cruz*, 2011 WL 2682967, at *4, 7-8, would necessarily amount to an impermissible "Trial by Formula" that would "abridge" PwC's rights to mount individualized defenses it is "entitled" to assert. *Wal-Mart*, 131 S. Ct. at 2559.

Plaintiffs' common contentions addressing job duties all suffer from the same defect—they each rely on supposedly "uniform evaluation[s]," "supervision," "uniform job training," and "mandatory audit program[s] and tools," which, even if accurately characterized, cannot prove what Senior Associates *actually do* in any given week. Mot. at 3, 7, 19-20. Under the "rigorous analysis" required at the class certification stage, these purportedly common policies and procedures come nowhere close to providing the requisite "glue" holding "the alleged reasons for" misclassification together because they do not constitute "persuasive[]" proof of misclassification as to *any* member of the putative class, let alone each of the 2,077 individuals therein. *Wal-Mart*, 131 S. Ct. at 2551; *Ellis*, 657 F.3d at 982. Indeed, "although [PwC] maintained uniform internal policies and was subject to professional standards, the evidence show[s] that the manner in which those policies and standards were implemented as to each associate or senior associate varied depending on multiple factors." *Soderstedt v. CBIZ S. Cal.*, 197 Cal. App. 4th 133, 154 (2011). These factors include the client's industry; the nature of the particular audit; the composition and identity of the audit team; the specific issues assigned to the Associate or Senior Associate; and the experience of the Senior Associate.[7]

These variables mean that Plaintiffs' claims thus cannot be adjudicated on a class-wide basis, a conclusion supported by numerous recent cases in which courts have declined to certify similarly

---

[6] Plaintiffs' motion and proposed class definition cover only Senior Associates in PwC's Attest Division, as they focus exclusively on "audit services," which only the Attest Division provides. Mot. at 1, 4. Any request to read the proposed class definition as covering PwC's entire Assurance line of service thus would be overbroad and unsupported by Plaintiffs' motion.

[7] Indeed, some Senior Associates, such as Jim Hooper, spent time on consulting engagements, to which the normal regulations and policies governing auditors do not apply. Poon Decl. Ex. 13 [Hooper Decl.] ¶ 11-15; *see also id.* Ex. 15 [Mijares Decl.] ¶ 15. A chart summarizing these and other dramatic differences reflected by even the current, incomplete record is attached to the Poon Declaration as Exhibit 1.

9

1   defective misclassification claims.  These include *Wong*, 2011 U.S. Dist. LEXIS 125988, at *8-9, 20;

2   *Cruz*, 2011 WL 2682967, at *4, 7-8; *Velazquez*, 2011 WL 4891027, at *7; and *Novak*, 2011 U.S.

3   Dist. LEXIS 146676, at *14-17; as well as *Soderstedt*, 197 Cal. App. 4th at 151—a remarkably

4   similar case brought by counsel in the related *Campbell* action now pending before this Court, which

5   undercuts many of Plaintiffs' substantive contentions here.[8]  In *Soderstedt*, plaintiffs asserted claims

6   on behalf of a putative class that included senior associates who worked for an accounting and

7   financial services firm, alleging overtime and meal and rest period violations under the California

8   Labor Code.  Although the plaintiffs there argued that "[e]ach audit, compilation or review [may be]

9   performed essentially the same way . . . through the use of a plan which would contain a checklist of

10  the necessary procedures," the evidence demonstrated that "associates and senior associates regularly

11  exercised varying levels of discretion and independent judgment, depending on a number of factors

12  including their level of experience and the nature of the engagement."  *Soderstedt*, 197 Cal. App. 4th

13  at 140, 149.  As in this case, certification was improper because plaintiffs' evidence purporting to

14  show that "each audit was performed essentially the same way" and that senior associates "did not

15  have discretion to deviate from the plan" could not avoid the need to conduct "individualized

16  inquiries to determine whether [the exemption's] elements were satisfied."  *Id.* at 140, 148.

17          Indeed, the overwhelming weight of authority—which PwC discusses in detail throughout

18  this brief—has denied certification of misclassification claims involving accounting and financial

19  services firms, due to (for example) evidence of the varied degree to which different employees

20  exercised judgment and discretion, were supervised, and performed work that directly impacted

21  management policies or general business operations.  *See, e.g.*, *Mekhitarian v. Deloitte & Touche*

22  *(ICS), LLC*, 2009 WL 6057248, at *4 (C.D. Cal. Nov. 3, 2009); *Nguyen v. BDO Seidman, LLP*, 2009

23  U.S. Dist. LEXIS 97524, at *27; *Soderstedt*, 197 Cal. App. 4th at 149; *Drake v. Morgan Stanley &*

24

25  ───────────────

26

27  [8]  *See Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007) ("[W]hen there is relevant
         precedent from the state's intermediate appellate court, the federal court must follow the state
28       intermediate appellate court decision unless the federal court finds convincing evidence that the
         state's supreme court likely would not follow it.").

1  *Co., Inc.*, 2010 WL 2175819, at *5 (C.D. Cal. Apr. 30, 2010).[9]

2          This Court should conclude likewise.  As post-*Wal-Mart* cases hold,[10] "rigorous analysis"

3  now demands that purportedly common evidence must be analyzed at the certification stage to

4  determine whether in fact such evidence can be used to resolve claims "in one stroke."  In *Ellis*, the

5  Ninth Circuit held that purportedly common evidence (there, expert testimony) must be evaluated for

6  its "persuasiveness," *i.e.*, its actual as opposed to its theoretical ability to resolve common questions

7  (and not merely its admissibility).  657 F.3d at 982; *see also, e.g.*, *Aburto v. Verizon Cal., Inc.*, 2012

8  U.S. Dist. LEXIS 329, at *9-10 n.1 (C.D. Cal. Jan. 3, 2012) ("pursuant to its duty to conduct a

9  'rigorous analysis,' the district court is charged with 'judging the persuasiveness of the evidence

10  presented'" (quoting *Ellis*)); *Hughes v. WinCo Foods*, 2012 U.S. Dist. LEXIS 2469, at *18-19 (C.D.

11  Cal. Jan. 4, 2012).  The Ninth Circuit also held that "the district court was required to *resolve* any

12  factual disputes necessary to determine whether there was a common pattern and practice that could

13  affect the class *as a whole*."  *Costco*, 657 F.3d at 983 (emphases added).  Similarly, in *Wong*, the

14  court's "rigorous analysis" necessitated digging deeper than just the plaintiffs' characterizations of

15  the record.  Doing so led the court to conclude, as should this Court, that "Defendant's evidence . . .

16  reveals that what Plaintiffs present as a uniform, consistent performance practice . . . simply does not

---

[9] In contrast, Plaintiffs cite just three financial services cases, which are utterly unpersuasive.  In both *Ho v. Ernst & Young*, 2011 WL 4403625 (N.D. Cal. Sept. 20, 2011), and the pre-*Wal-Mart* case *Brady v. Deloitte & Touche LLP*, 2010 WL 1200045 (N.D. Cal. Mar. 23, 2010), the courts failed to apply anything approximating the "rigorous analysis" required under *Wal-Mart* and *Ellis*, and based their reasoning on "common" questions that are no longer tenable after the Ninth Circuit's decision in *Campbell*, including "whether the professional exemption under California law requires a license for accountants, [and] whether accounting is a 'learned profession[.]'" *Ho*, 2011 WL 4403625, at *6 and *Brady*, 2010 WL 1200045, at *10.  The *Ho* Court even "harbor[ed] some reservations with respect to the commonality element." *Ho*, *supra*, at *6.  Similarly, *Litchfield v. KPMG LLP*, No. 07-2-11179-4 (Wash. Super. Ct. Nov. 25, 2009)—an unexplained, four-page, state trial court order—does not analyze predominance, nor can it be reconciled with *Wal-Mart* or *Campbell*.

[10] "Rigorous analysis" at class certification has long been required, and the Ninth Circuit even purported to undertake such an analysis in its now-reversed en banc opinion in *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 597-98 (9th Cir. 2010) (en banc).  But the Supreme Court's opinion in *Wal-Mart* brings into sharper relief and clarifies what the requisite "rigorous analysis" actually entails, as *Ellis* demonstrates.  657 F.3d at 982.

Gibson, Dunn & Crutcher LLP

exist." 2011 U.S. Dist. LEXIS 125988, at *16-17.

### 1. Class-Wide Proof Cannot Resolve Whether Plaintiffs Are Primarily Engaged in Work Requiring Discretion and Independent Judgment (Contention 9).[11]

PwC will discuss the elements that are distinct to each exemption below, but at the outset it is glaringly apparent that Plaintiffs fail in their attempt to gloss over the dramatic variation in the record as to Senior Associates' exercise of discretion and independent judgment—an element common to *both* the administrative and professional exemptions. Plaintiffs therefore fail to establish commonality and cannot possibly establish predominance.

### a. The Nature and Degree of Discretion Exercised by Different Senior Associates Vary Substantially.

Plaintiffs have submitted three cookie-cutter declarations reciting "uniform" corporate policies and baldly asserting that "PwC's audit computer program . . . directed my daily activities" on "every audit." Bonilla Decl. ¶ 15; Chen Decl. ¶ 15; Viller Decl. ¶ 15.[12] But those declarations and Plaintiffs' other evidence fail to lay any foundation to extrapolate from the experiences of these three declarations to the experiences over more than eight years of all 2,077 putative class members here. *Cruz*, 2011 WL 2682967, at *4, 7-8; *Novak*, U.S. Dist. LEXIS at *14-16. Nor can they. The record is clear that any given Senior Associate's day-to-day job duties and the nature and degree of his or her discretion and independent judgment varied substantially from one engagement to another— based on several factors, including the client's industry, whether the client was publicly or privately owned, the size of the engagement team, and the particular Senior Associate's area and amount of expertise.[13] As this Court implicitly recognized in denying certification of a class of associates

---

[11] The numbering of Plaintiffs' contentions herein (*e.g.*, "Contention 9") corresponds with the enumeration of Plaintiffs' purportedly common contentions on pages 19 and 20 of their Motion.

[12] Plaintiffs' brief cites testimony from five putative class members, Mot. at 4, but Powell and Tucker have elected to withdraw their declarations instead of allowing PwC to test the accuracy of their assertions at their noticed depositions.

[13] Plaintiffs' contrary position is unsupported and unpersuasive. Plaintiffs' three declarants profess in unison that "[b]ased on . . . discussions with my colleagues . . . my job duties were largely the same as those of other Senior Associates." Bonilla Decl. ¶ 12; Viller Decl. ¶ 12; Chen Decl. ¶ 12. Apart from the utter lack of foundation for such a sweeping pronouncement, Bonilla tellingly admitted in her deposition that she could not recall contributing any information to the

Gibson, Dunn & Crutcher LLP

working in different PwC divisions, Plaintiffs' experiences cannot fairly be extrapolated to every member of a putative class where, as here, there is evidence of "significant differences in the work performed." *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 604 (E.D. Cal. 2008). As a result, Plaintiffs' claims in this respect cannot be resolved through common proof.

That Senior Associates work against the backdrop of Generally Accepted Accounting Principles and Generally Accepted Auditing Standards ("GAAP" and "GAAS," respectively) does not establish commonality. To the contrary, those professional standards call for the exercise of discretion and independent judgment, and require the application of different ideas and principles depending on the particular facts of any given situation. Poon Decl. Ex. 32 [Randall Depo.] at 49:14-50:15. Thus it is clear that "[a]uditing inherently is a judgment-based profession" that necessarily involves critical thinking on a "daily basis." Poon Decl. Ex. 4 [Clarke Decl.] ¶ 10; *see also, e.g.*, *id.* Ex. 18 [Pierotti Decl.] ¶ 7; *id.* Ex. 21 [Rungta Decl.] ¶ 17; *id.* Ex. 6 [Crane Decl.] ¶ 17.

Furthermore, different engagements involve varying degrees and types of discretion and independent judgment. For example, as an unlicensed Senior Associate, Harsh Rungta developed such an expertise in auditing financial instruments and business combinations in the semiconductor industry that colleagues, "from Associates to Managers and Partners . . . sought [him] out for guidance in those areas." Poon Decl. Ex. 21 [Rungta Decl.] ¶ 7; *see also, e.g., id.* Ex. 17 [Peters Decl.] ¶ 6. Rungta testified that this audit area—which requires the auditor to assign values to intangibles, research industry expectations, and evaluate management's financial forecasts—is "particularly complicated and required more scrutiny and attention and a higher level of judgment." Poon Decl. Ex. 21 [Rungta Decl.] ¶ 18.[14] Similarly, as a Manager, Brian Shackley supervised and reviewed the work of Senior Associates who audited revenue recognition for a video game client, which involves balancing qualitative and quantitative factors and requires far more judgment than

---

drafting of this statement, Poon Decl. Ex. 24 [Bonilla Depo.] at 394:25-395:16, nor remember any of the colleagues with whom she purportedly discussed job duties, *id.* at 396:21-397:6.

[14] *See also, e.g., Soderstedt*, 197 Cal. App. 4th at 148 (associates and senior associates undertook various "research assignments" and thus "regularly exercised varying levels of discretion and independent judgment"); *Nguyen*, 2009 U.S. Dist. LEXIS 97524, at *19-20 (same).

Gibson, Dunn & Crutcher LLP

Case No. 2:08-cv-00965 – LKK/GGH
DEFENDANT'S MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION

1    auditing revenue recognition in other industries.  Poon Decl. Ex. 22 [Shackley Decl.] ¶¶ 8, 16; *see*

2    *also id.* Ex. 10 [Dodson Decl.] ¶ 12 ("[T]wo auditors could look at all the factors and make two

3    different, reasonable determinations.").[15]

4         Reviewing the work of other associates is also a "significant if not [the] primary responsibility

5    for senior associates," *Campbell*, 253 F.R.D. at 604-05, and the differences inherent in doing so

6    further illustrate the extent to which Senior Associates exercise a broad range of discretion.

7    Engagement teams vary in size depending on the scope of the services offered to the client, and

8    sometimes a Senior Associate is the most senior person at the client site on a day-to-day basis.[16]  The

9    nature of supervision varies depending on the assignment.[17]  In fact, Mauro Botta has described at

10   least one engagement where, as a "lead Senior Associate," he supervised up to eight Associates *and*

11   *other Senior Associates*.  Poon Decl. Ex. 3 [Botta Decl.] ¶ 14; *see also id.* Ex. 33 [Schini Depo.] at

12   81:21-23, 150:4-151:2; *id*. Ex. 24 [Bonilla Depo.] at 185:20-186:5 ("the lead senior associate would

13   delegate to the other senior associates"); *id.* Ex. 28 [Kenny Depo.] at 428:13-429:10, 488:24-489:14

14   (as a Senior Associate, she was reviewed and supervised by another Senior Associate); *cf. Campbell*,

15

---

16   [15] As another example, Will Weatherly worked almost exclusively as a Senior Associate for one

17   publicly-traded company, for which he audited the client's impairment of its fixed income
     securities, which required "inherently subjective inquiries" because the client had relied on

18   inherently subjective factors, such as whether the decline in certain stock prices was tied to a
     decline in interest rates or other factors.  Poon Decl. Ex. 23 [Weatherly Decl.] ¶¶ 12-13; *see also,*

19   *e.g.*, *id.* Ex. 3 [Botta Decl.] ¶ 12.  Other Senior Associates such as Harsh Rungta worked with
     private companies, where smaller teams often mean that the Senior Associate has more

20   responsibility to manage "the audit from planning to execution to wrap-up."  Poon Decl. Ex. 21
     [Rungta Decl.] ¶ 25.  Because these "smaller private company clients" tend to have less

21   sophisticated accounting practices, the Senior Associate is "more often [required to exercise]
     judgment to determine the best way to explain accounting issues to ensure the audit process was

22   thorough."  *Id*.; *see also id.* Ex. 32 [Randall Depo.] at 75:8-16; *see also, e.g., id.* Ex. 9 [Devlin

23   Decl.] ¶ 17 (contrasting work on public and private companies).

24   [16] Poon Decl. Ex. 21 [Rungta Decl.] ¶ 11; *id.* Ex. 33 [Schini Depo.] at 194:5-13; *id.* Ex. 19 [Piziali

25   Decl.] ¶ 9; *id.* Ex. 6 [Crane Decl.] ¶ 27; *id.* Ex. 14 [McClelland Decl.] ¶ 8; *id.* Ex. 27 [Kenny
     Depo.] at 280:17-281:3.

26   [17] *Compare* Poon Decl. Ex. 17 [Peters Decl.] ¶ 15 (brought in on one engagement to address two

27   technical accounting matters and did not have any supervising responsibilities), *and id*. Ex. 21
     [Rungta Decl.] ¶ 17 (spent most of his time as a non-lead Senior Associate on fieldwork and

28   testing instead of supervising), *with id.* Ex. 22 [Shackley Decl.] ¶ 23 (extensive supervising
     responsibilities).

253 F.R.D. at 602 (finding a "sufficiently significant difference between associates and senior associates to warrant exclusion of the latter group from the class," in part because "[a] significant if not primary responsibility for senior associates is to review the work of associates").  There is considerable variation in how much time any given Senior Associate spends supervising, coaching, and reviewing the work of less experienced team members, depending on the engagement and the composition of the engagement team.[18]

All of these variations are critical to the question whether a given Senior Associate is primarily engaged in exempt work, because when Senior Associates' "responsibilities include[] supervising several employees," they "necessarily require [Senior Associates] to exercise discretion and independent judgment."  *Piscione v. Ernst & Young L.L.P.*, 171 F.3d 527, 537 (7th Cir. 1999). Supervision requires independent thought and judgment because each Senior Associate must assess, based on his or her cumulative audit and accounting experience and education, whether the documentation satisfies the conclusion that the supervised associate reached.  Poon Decl. Ex. 3 [Botta Decl.] ¶ 16; *see also, e.g.*, *id*. Ex. 11 [Enbom Decl.] ¶ 17.  Each associate has a different personality and different strengths and weaknesses, so it is necessary to tailor the advice, insight and constructive criticism to each individual Associate and to evaluate the skills, capabilities and experience level of an Associate before providing targeted coaching.  Poon Decl. Ex. 3 [Botta Decl.] ¶ 15.[19]

---

[18]  *See, e.g.*, Poon Decl. Ex. 3 [Botta Decl.] ¶ 14 (spent 70% of his time coaching team and reviewing associates' work); Shackley Decl. ¶ 23 (40%); *id.* Ex. 4 [Clarke Decl.] ¶ 8 (20%); *id.* Ex. 17 [Peters Decl.] ¶ 15 (no time spent coaching and reviewing work on one engagement); *id.* Ex. 24 [Bonilla Depo.] at 225:9-12 (amount of time spent coaching varied by engagement).

[19]  In addition to supervision, Senior Associates perform varying degrees of "client services . . . requir[ing] [them] to exercise discretion and independent judgment."  *Piscione*, 171 F.3d at 535.   The amount of client contact varies based on numerous factors, including the nature of the audit and the Senior Associate's level of experience.  Poon Decl. Ex. 10 [Dodson Decl.] ¶ 10, 18.  The particular stage of the audit is also an important variable.  At the outset of an engagement, associates might conduct research concerning the business and "what was happening to that industry" in order to aid in the application of "professional judgment."  Poon Decl. Ex. 32 [Randall Depo.] at 94:9-17.  And as Senior Associates learn more about a client's business, they have greater opportunities to interact with the client and make recommendations.  Poon Decl. Ex. 22 [Shackley Decl.] ¶ 19.  In doing so, Senior Associates draw on their varying "knowledge of auditing standards," assessing whether the information the client provides "makes sense or not" and when to "go back and ask . . . more questions or [for] more evidence."  Poon Decl.

That Senior Associates exercise varied levels of discretion and independent judgment is made clear by testimony from Plaintiff Kress, and PwC's declarants, Harsh Rungta and Ryan Adams:

| Kress | Rungta | Adams |
|-------|--------|-------|
| When researching clients, only performed cursory review of their websites. Poon Decl. Ex. 30 [Kress Depo.] at 368:15-369:2.[20] | Performed detailed research and analysis of the risks specific to the client and used judgment to tailor the audit steps accordingly. Poon Decl. Ex. 21 [Rungta Decl.] ¶¶ 26, 27. | Spent a full week researching a client and its industry and then trained his team on the industry-specific nuances of the audit. Poon Decl. Ex. 2 [Adams Decl.] ¶¶ 10, 12. |
| Never created initial audit strategies or plans. Poon Decl. Ex. 30 [Kress Depo.] at 309:12-15. | Exercised judgment in creating first drafts of audit plans and drafting audit strategy memos. Poon Decl. Ex. 21 [Rungta Decl.] ¶ 12. | Developed audit plan after determining what areas presented heightened fraud risks and how to test them; led audit planning meeting which included Partner and Manager. Poon Decl. Ex. 2 [Adams Decl.] ¶¶ 10, 11. |
| When interacting with clients, only read from scripts provided to him by PwC. Poon Decl. Ex. 30 [Kress Depo.] at 375:2-16; 439:14-441:23. | Relied on his accounting knowledge and independent judgment (not manuals and scripts) when communicating with clients. Poon Decl. Ex. 21 [Rungta Decl.] ¶ 11. | Worked directly with client's CFO to resolve unique issue of classifying assets in a way that did not trigger client's debt-to-equity covenants with lenders. Poon Decl. Ex. 2 [Adams Decl.] ¶ 16. |
| Did not apply accounting or auditing principles in his work. Poon Decl. Ex. 30 [Kress Depo.] at 341:8-342:6. | Regularly used judgment to apply accounting and auditing principles in his work. Poon Decl. Ex. 21 [Rungta Decl.] ¶ 9. | Researched various accounting pronouncements, then analyzed and interpreted those rules before applying them to his client's facts. Poon Decl. Ex. 2 [Adams Decl.] ¶ 15. |
| Assigned tasks to associates only by considering who was | Staffed his own audit teams by considering the | Learned as much as he could about team members' |

32 [Randall Depo.] at 76:18-78:6; 118:2-21; *see also, e.g., id.* Ex. 3 [Botta Decl.] ¶ 12 (presenting recommendations directly to the client's CFO); *id.* Ex. 15 [Mijares Decl.] ¶ 14. Further, at least some Senior Associates provide input for clients concerning which disclosures are necessary given each client's unique circumstances and draft management letters—activities that require the use of independent judgment. Weatherly Decl. ¶ 14; *see also, e.g.*, Rungta Decl. ¶ 20.

[20] The tables in this brief reflect testimony from Plaintiffs' witnesses. PwC does not concede that Plaintiffs have testified accurately; to the contrary, there are numerous reasons to question this testimony, as discussed *infra*, Part III.C.

Gibson, Dunn & Crutcher LLP

| available.  Poon Decl. Ex. 30 [Kress Depo.] at 312:19-313:16; 314:21-315:2. | experience/capabilities of the associates, the client's business, and the scope of the audit.  Poon Decl. Ex. 21 [Rungta Decl.] ¶ 15. | experience/capabilities and used substantial discretion to finalize a staffing plan that maximized resources.  Poon Decl. Ex. 2 [Adams Decl.] ¶ 11. |
|---|---|---|

All this shows that Plaintiffs' misclassification claims cannot be litigated categorically, without regard to the different tasks performed by each individual Senior Associate from week-to-week and engagement-to-engagement.

> **b.      Plaintiffs Cannot Obfuscate the Differences in Judgment and Discretion Exercised by Putative Class Members.**

Notwithstanding this evidence of the varying degrees to which different Senior Associates exercise discretion and independent judgment, Plaintiffs wrongly contend that such judgment and discretion can be proven on a common, class-wide basis by resorting to PwC's guides and policies governing audit procedures.  Mot. at 25.  These policies and procedures, however, do not "govern how employees spent their time," nor are they anywhere as detailed or specific to "necessarily" "reflect the realities of the workplace" without the need for additional, individualized "inquiries into how much time each individual [Senior Associate] spent" on exempt activities.  *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d at 958-59; *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 936, 945-47 (9th Cir. 2009); *Wong*, 2011 U.S. Dist. LEXIS 125988, at *23; 29 C.F.R. § 541.308(a) (2001).[21]   Therefore, these supposed sources of common proof cannot obviate the need to grapple with the reality of the varied judgment and discretion actually used by any given Senior Associate in any given week.

Tellingly, Plaintiffs fail to directly quote any of PwC's supposedly "uniform" policies.  This is because PwC's policies typically are set forth in broad, generalized terms that necessarily

---

[21]  The Wage Order explicitly incorporates certain federal regulations effective when it was enacted in 2001, including 29 C.F.R. §§ 541.207, 541.301(a)-(d), and 541.308.  Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(e).  Subsequent revised versions of those federal regulations are also instructive, because the revisions "were not meant to effect any substantive change in the exemptions."  *Heffelfinger v. Elec. Data Sys. Corp.*, 580 F. Supp. 2d 933, 950 n.77, 958 (C.D. Cal. 2008);  *accord Soderstedt*, 197 Cal. App. 4th at 150; *Combs v. Skyriver Commc'ns, Inc.*, 159 Cal. App. 4th 1242, 1256, 1265 (2008); *see also Harris v. Superior Court*, --- Cal. 4th ----, 2011 WL 6823963, at *10 & n.11 (Dec. 29, 2011).

contemplate and call for substantial variation in the myriad circumstances in which different Senior

Associates work.  For example, one policy requires Senior Associates to "[d]esign engagement

procedures and audit program[s] based on risk, materiality, and discussions with the engagement

team . . . and tailor the engagement steps appropriately."  Poon Decl. Ex. 37 [Performance Coaching

& Development] at 30.  "[T]he vague nature of these job duties suggests that considerable discretion

was left to each [Senior Associate] regarding how to carry out each job function.  As such, the

inquiry into whether or not [a Senior Associate] is properly classified as exempt becomes individual

in nature."  *Velazquez*, 2011 WL 4891027, at *7.  "[U]niform policies and training materials may

provide some proof of a common employment experience among class members, but '[they do] not

provide common proof of whether the [Senior Associates] were spending more than fifty percent of

their time performing exempt tasks.'"  *Id.* (quoting *Cruz*, 2011 WL 2682967, at *8); *see also* 29

C.F.R. § 541.704 (2004)) ("The use of manuals, guidelines or other established procedures . . . that

can be understood or interpreted only by those with advanced or specialized knowledge or skills does

not preclude exemption.").

Plaintiffs' suggestion that all audits are "the same" is akin to contending that all trials are the

same because they begin with opening statements, include direct- and cross-examination, and end

with closing arguments.  But that is not even the correct perspective from which to view what Senior

Associates do.  To the contrary, "every audit [is] different," Poon Decl. Ex. 2 [Adams Decl.] ¶ 17; *see

also, e.g.*, *id.* Ex. 19 [Devlin Decl.] ¶ 17; *id.* Ex. 11 [Enbom Decl.] ¶ 7, based on a number of

different variables, including the client's size, industry, and whether the client is public or private.

And the varied texture of the work Senior Associates perform cannot be smoothed over by resort to

PwC's audit policies, because those policies themselves call for the exercise of significant and

varying amounts of discretion and thus cannot constitute "common" proof.  Indeed, the record is clear

that the policies affirmatively call for judgment, not serve as a substitute for it.  As one putative class

member explained:  "*Nearly all of the work I performed as a Senior Associate involved gray areas

that are subject to interpretation and judgment calls*, requiring me to draw upon my personal

experiences, education, on-the-job training, past accounting knowledge, and my network of

colleagues.  Poon Decl. Ex. 3 [Botta Decl.] ¶ 6 (emphasis added).

1    But Plaintiffs are wrong that all audits are essentially the same and that PwC somehow

2    micromanages Senior Associates' work through pre-determined, computerized "audit steps."  Mot.

3    at 7-9.  "[T]he role of PwC audit guides is not to provide granular instruction about each aspect of

4    what a Senior Associate has to do to perform [the] work."  Poon Decl. Ex. 22 [Shackley Decl.] ¶ 21;

5    *see also, e.g.*, *id.* Ex. 23 [Weatherly Decl.] ¶ 10; *id.* Ex. 10 [Dodson Decl.] ¶ 16.  Some audit steps

6    also specifically instruct the auditor to exercise judgment, such as one that requires the auditor to

7    document the professional judgment used.  Maryott Decl. Ex. S1 [Clous Decl. ¶ 10, Ex. B]; *see also*

8    *id.* Ex. S10 [Kenny Depo. Ex. 31] (audit step completed by Ms. Kenny asked her to develop

9    expectations based on industry knowledge and discussions with the client and to draw conclusions).

10   To the contrary, interpreting and applying the audit guides calls for discretion and independent

11   judgment.  Maryott Decl. Ex. S2 [Dodson Decl. ¶ 16 Ex. A] (audit step asking the auditor to assess

12   appropriateness of management's accounting policy and estimation methodology); Poon Decl. Ex. 18

13   [Pierotti Decl.] ¶ 14 ("the PwC Audit Guide is a tool that provides guidance on different audit

14   approaches, but judgment is involved as to which approach to take"); *id.* Ex. 11 [Enbom Decl.] ¶ 22

15   (audit database provides a "general work plan that must be tailored to fit the client-specific issues

16   raised in each individual engagement.").  One of Plaintiffs' own declarants even characterized the

17   PwC step for auditing revenue as "very broad" and admitted the need to "tailor[]" it on "every

18   engagement."  Poon Decl. Ex. 34 [Viller Depo.] at 242:5-17.  And Senior Associates frequently

19   design additional testing procedures beyond what those guides call for.  Poon Decl. Ex. 9 [Devlin

20   Decl.] ¶ 12; *id.* Ex. 12 [Flournoy Decl.] ¶ 13.  For example, as an unlicensed Senior Associate, Mike

21   Devlin audited a new category of revenue for a film production studio, creating a testing approach

22   from the ground up based on his own experience, brainstorming with colleagues, and "limited

23   guidance" from the PwC audit guides.  Poon Decl. Ex. 9 [Devlin Decl.] ¶ 12; *see also, e.g.*, *id.* Ex. 2

24   [Adams Decl.] ¶ 14; *id.* Ex. 20 [Rashid Decl.] ¶ 15 (adjusted a PwC audit step to ensure consistency

25   with SEC rules).  Similarly, Mauro Botta "completely customize[d]" an audit approach "because

26   there was not a standard audit step in the PwC database to test this client-specific account."  Poon

27   Decl. Ex. 3 [Botta Decl.] ¶ 10.  Brian Shackley drafted a memo recommending how a client should

28   account for a highly atypical transaction—a $19 million purchase of a financial software package that

involved a lease-back agreement to finance the purchase, substantial labor costs to implement the software, and a write-off of the defective software components. Shackley began the memo, which took two weeks to draft, research, and revise, by gathering facts and spotting the various accounting issues, then he set forth the relevant accounting principles and rules, and finally he applied those rules to the unique facts of the transaction—all unaided by any checklist or template and with limited review from his Manager. Poon Decl. Ex. 22 [Shackley Decl.] ¶¶ 24, 25. As Shackley notes:

> [M]y teams don't keep PwC audit guides open or next to them while they work. These guides are only references for occasional guidance. The content of the guides typically lags innovation within each industry. There is no way for the authors to know, for example, that video game producers will start making games with online functionality. The innovation occurs first, then auditors—including Senior Associates—work through ways to account for this innovation, and the guides are updated later.

Poon Decl. Ex. 22 [Shackley Decl.] ¶ 21. Senior Associates have even unilaterally changed or tailored an audit step as needed. Poon Decl. Ex. 33 [Schini Depo.] at 126:16-22; *see also, e.g., id.* Ex. 20 [Rashid Decl.] ¶ 15.

Indeed, consistent with PwC's audit guides, and as was true in *Soderstedt*, PwC "managers and directors expect[] . . . senior associates to exercise their discretion and professional judgment as they perform[] their job duties." 197 Cal. App. 4th at 149; Poon Decl. Ex. 4 [Clarke Decl.] ¶ 10; *id.* Ex. 16 [O'Connor Decl.] ¶ 17. The expected discretion extends to numerous matters, ranging from independent research regarding "new developments" relevant to the client, to interpretation of data and test results, to numerous judgment calls under the applicable GAAP and GAAS provisions. Poon Decl. Ex. 2 [Adams Decl.] ¶¶ 13, 14; *id.* Ex. 9 [Devlin Decl.] ¶ 12; *id.* Ex. 32 [Randall Depo.] at 49:14-50:15; *see supra* Part III.A.1.a; 29 C.F.R. § 541.207 (2001) ("[T]he exercise of discretion and independent judgment involves the comparison and evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." ). Under PwC's policies and guidelines, "putative class members are expected to evaluate 'grey areas,' . . . use their judgment and discretion when researching and analyzing . . . issues for clients . . . , and assume additional responsibility based on a number of factors," and therefore the policies themselves cannot obviate the need for individualized inquiries concerning the nature and degree of discretion used in any given week. *Nguyen*, 2009 U.S. Dist. LEXIS 97524, at *20. Neither can the testimony of any

one class member, because extrapolating without basis from such testimony to the rest of the 2,077-member class would necessarily entail a "Trial by Formula" in derogation of PwC's basic right to due process. *Wal-Mart*, 131 S. Ct. at 2559; *Cruz*, 2011 WL 2682967, at *4, 7-8; *Novak*, 2011 U.S. Dist. LEXIS 146676, at *15-16.

Plaintiffs' attempt to extrapolate is particularly unavailing here given the meager *quantity* of the testimony they rely on (Plaintiffs' brief relies on the testimony of only five out of over 2000 potential class members) and the questionable *quality* of that testimony.  Plaintiffs' declarants all recite verbatim that the PwC "audit computer program . . . directed [their] daily activities" and that they exercised no "discretion regarding matters of significance."  Bonilla Decl. ¶ 15; Chen Decl. ¶ 15; Viller Decl. ¶ 15.  Similarly, named Plaintiff Kress testified that PwC's expectations for professional judgment are limited to refraining from "touching [coworkers] inappropriately," and the only example he could give of exercising judgment as a Senior Associate involved choosing "what [clothes] to wear."  Poon Decl. Ex. 30 [Kress Depo.] at 354:2-9, 401:14-402:15.

There are only three ways to make sense of Plaintiffs' testimony.  *First*, the testimony lacks relevance (and underscores the named Plaintiffs' atypicality and inadequacy as class representatives) because the employees fall well short of PwC's "reasonable requirements of the job" and "should not thereby be able to evade a valid exemption" through their "own substandard performance."  *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 802 (1999).[22]  *Second*, the Court could preliminarily find that Plaintiffs' testimony is accurate as to their experiences.  In that case, the testimony *bolsters* PwC's claim that different Senior Associates perform materially different duties, as Plaintiffs' testimony

---

[22] PwC expects Senior Associates to exercise independent judgment and to *not* approach each audit mechanically.  Poon Decl. Ex. 37 [Performance Coaching & Development] at 17, 19 ("A Senior Associate . . . [d]isplays professionalism, discretion, and sound judgment," is "[w]illing to take a position that challenges the prevailing opinion" and "[d]emonstrates critical thinking skills to understand business issues relevant to client and project."); *id.* Ex. 4 [Clarke Decl.] ¶ 10 (A "Senior Associate who performs work in a formulaic or robotic manner will be reviewed poorly, denied promotion, or let go."); *id.* Ex. 6 [Crane Decl.] ¶ 10 ("[A] Senior Associate who solely relies on PwC audit guidance would struggle in the role of Senior Associate because no guidance takes into account all of the different facts and circumstances of each client."); *id.* Ex. 12 [Flournoy Decl.] ¶ 13 (was expected to re-evaluate the approach to every audit); *id.* Ex. 25 [Chen Depo.] at 302:5-23 ("the PwC Code of Conduct" prohibits Senior Associates from simply taking directions and following them "blindly").

stands in stark contrast to the testimony of the many Senior Associates who perform complicated

tests requiring judgment and creativity.  If Mr. Kress did not exercise any greater judgment than

deciding what clothes to wear, and if Brian Shackley exercised substantial judgment in drafting a

comprehensive memo that involved issue spotting, identifying the applicable accounting rules, and

applying those rules to his client's unique set of facts (Poon Decl. Ex. 22 [Shackley Decl.] ¶ 25), then

those two Senior Associates clearly *did not perform the same type of work* at PwC and therefore do

not belong in the same class.  *Campbell*, 253 F.R.D. at 600 ("[C]learly if the class members exercise

[discretion and independent judgment] differently, class certification is suspect.").  *Third*, the Court

may preliminarily find for purposes of this motion that Plaintiffs' testimony is incredible, both

because it is inherently implausible and because it is contradicted by countless reviews and self-

evaluations.  *See infra* Part III.C.  In no event, however, does such testimony support class

certification when considered within the totality of the evidence before the Court.

   Plaintiffs also fail to account for the spectrum of material seniority distinctions within the

putative class, as newer Senior Associates and more experienced Senior Associates, for example,

often perform different duties.  Poon Decl. Ex. 22 [Shackley Decl.] ¶ 19; *id.* Ex. 15 [Mijares Decl.]

¶ 9; *id.* Ex. 9 [Devlin Decl.] ¶ 9; *id.* Ex. 18 [Pierotti Decl.] ¶ 9.  While new Senior Associates have

considerable leadership responsibilities, more experienced Senior Associates are the ones who

typically manage other associates and Senior Associates performing the audit areas requiring the

highest levels of independent judgment.  *Id.*  As one PwC Senior Manager explained, new Senior

Associates "use one type of judgment, such as professional skepticism," while experienced Senior

Associates exercise a deeper type of judgment developed from a broader understanding of client and

team needs.  Poon Decl. Ex. 4 [Clarke Decl.] ¶ 11.

   Even worse for Plaintiffs' class definition, the most experienced Senior Associates often fill

the role of Manager on an engagement (though they are still technically Senior Associates and thus

members of Plaintiffs' putative class).  Poon Decl. Ex. 22 [Shackley Decl.] ¶ 22; *id.* Ex. 3 [Botta

Decl.] ¶ 17; *id.* Ex. 15 [Mijares Decl.] ¶ 13; *id.* Ex. 6 [Crane Decl.] ¶ 8; *id.* Ex. 24 [Bonilla Depo.] at

188:23-189:11 ("[An Acting Manager is] somebody who was not yet officially a manager, but is

taking on responsibilities as such.").  Managers exercise considerable independent judgment over

1    issues of far-reaching importance to the team and client and make decisions that drive the entire

2    scope of the engagement, from "planning to wrap-up." Poon Decl. Ex. 38 [Assurance Expectations

3    Guide] at 25–34.[23] Plaintiffs therefore undermine their own case for class certification by attempting

4    to cobble together a polyglot class consisting of Senior Associates of increasing seniority, who carry

5    out very different roles and responsibilities. *Cf. Campbell*, 253 F.R.D. at 605 ("[T]here does seem to

6    be a sufficiently significant difference between associates and senior associates to warrant exclusion

7    of the latter group from the class.").

8            Plaintiffs also make much of the fact that Senior Associates' work is reviewed by other

9    members of the engagement team. Mot. at 9. But this does not avoid the need for individualized

10   inquiries, because the mere fact "[t]hat proposed class members' work was reviewed . . . does not

11   mean that they failed to exercise discretion and independent judgment as required by the Wage

12   Order." *Mekhitarian*, 2009 WL 6057248, at *5. Nor is it dispositive (or even particularly relevant)

13   that PwC partners sign audit opinions. Mot. at 9. As numerous courts have recognized:

14           [T]he term "discretion and independent judgment" does not require that the decisions
             made by an employee have a finality that goes with unlimited authority and a
15           complete absence of review. *The decisions made as a result of the exercise of
             discretion and independent judgment may consist of recommendations for action
16           rather than the actual taking of action.*

17   *Mekhitarian*, 2009 WL 6057248, at *5 (quoting 29 C.F.R. § 541.202(c)) (emphasis added).[24] So too

18   _____

19

20   [23] As an unlicensed Senior Associate working in the Manager role, Adrienne Davis's work
     "consisted of flying to the six different site locations to meet with the PwC team and conducting a
21   high-level review of some of the higher-risk areas that other Senior Associates had already
     reviewed," as well as working directly with the Partner to make "high-level judgment calls."
22   Poon Decl. Ex. 8 [Davis Decl.] ¶¶ 6, 7. Even named Plaintiffs Kress and Kenny acknowledge in
     their depositions that Managers are vested with greater opportunities to exercise discretion, and
23   thus admit that some Senior Associates—those filling the Manager role—exercise more judgment
     than do other Senior Associates. Poon Decl. Ex. 29 [Kress Depo.] at 255-24-256:14, 282:16-24;
24   *id.* Ex. 30 [Kress Depo.] at 311:8-17, 325:4-10, 347:5-348:6, 386:13-20, 388:10-16, 431:4-15,
     477:18-478:9; *id.* Ex. 27 [Kenny Depo.] at 64:24-65:15, 99:5-15, 134:19-135:2, 148:23-25,
25   178:15-179:11, 181:8-182:8, 196:5-10.

26   [24] *See also, e.g., Soderstedt*, 197 Cal. App. 4th 133 at 149; *United Parcel Serv. Wage & Hour
     Cases*, 190 Cal. App. 4th 1001, 1027 (2010); *Piscione*, 171 F.3d at 535. Similarly, in *Zelasko-
27   Barrett v. Brayton-Purcell, LLP*, 198 Cal. App. 4th 582, 591 (2011), the court held that a law
     clerk's "responsibilities required the exercise of discretion and judgment" even though his "work
28   was supervised, corrected, and approved by a supervising attorney, . . . 'the ultimate decision to

1    here.  As this Court has previously explained, "the fact that the work of PwC associates and senior

2    associates is subject to review is not sufficient to prove that they are performing non-exempt work."

3    *Campbell*, 253 F.R.D. at 602; *see also* 29 C.F.R. § 541.207(e)(1) (2001).

4         Consequently, common proof cannot possibly resolve the question whether each individual

5    Senior Associate exercised discretion and independent judgment in any given week.

6         **2.    Common Proof Cannot Resolve the Remaining Elements of the Administrative
                   Exemption.**

7         Though the inability to resolve the discretion and independent judgment inquiry should be

8    enough to demonstrate that common issues could not possibly predominate, the other elements of the

9    administrative exemption are similarly not susceptible to common proof.

10        **a.    Whether Senior Associates Work Under More than General Supervision
                  (Contention 7)**

11

12        Plaintiffs cannot avoid the need for individualized inquiry by contending that because Senior

13   Associates' work is subject to review and approval, they must necessarily work under more than

14   "general supervision" for purposes of the administrative exemption. Mot. at 9-11; 19.

15   The mere fact of review cannot resolve the "general supervision" question at all, let alone for each

16   individual Senior Associate, because the evidence "shows that proposed class members were subject

17   to differing supervision dependent on their skills, assignments, and experience." *Mekhitarian*, 2009

18   WL 6057248, at *4.  This "highly contested fact issue" will require examining a "wealth of evidence

19   about the nature and scope of PwC's supervision"—an endeavor made even more fact-intensive by

20   the absence of definitive "guidance" on the question of what "general supervision" actually entails.

21   *Campbell*, 642 F.3d at 832.

22        Class certification has regularly been denied where "the level of general supervision provided

23   to associates and senior associates varied depending on the individuals involved and the type of

24   engagement." *Soderstedt*, 197 Cal. App. 4th at 149; *accord Mekhitarian*, 2009 WL 6057248, at *4;

25   *Nguyen*, 2009 U.S. Dist. LEXIS 97524, at *22.  That is precisely the case here, where the degree of

26   supervision varied with numerous factors, including (among others) the Senior Associate's

27

28        craft an argument' was not made by him . . . and . . . he could not . . . sign[] pleadings . . . [or]
          render[] advice to clients."

competency, experience, and how he or she is perceived, as well as the supervisor's management style and the nature of the engagement.[25]  The evidence aptly demonstrates the striking differences among the various levels of supervision under which each Senior Associate worked in a given week. For instance, Plaintiffs' declarant (Chen) provided markedly different testimony in this regard than did PwC's declarants (Rungta and Davis):

| Chen | Rungta | Davis |
| --- | --- | --- |
| Spent most of her time just following the PwC guide and what her managers told her to do.  Poon Decl. Ex. 25 [Chen Depo.] 264:21-265:6. | Worked under Manager who trusted his judgment and expected him to make decisions in the first instance. Poon Decl. Ex. 21 [Rungta Decl.] ¶ 28. | Only worked under the supervision of a Partner, whom she communicated with twice per week by phone. Poon Decl. Ex. 8 [Davis Decl.] ¶ 7. |
| Stated that, if she could not find an answer in the PwC Audit Guide, she would ask the manager.  Poon Decl. Ex. 25 [Chen Depo.] 187:3-15. | Used his Manager as a resource to discuss complex issues and share knowledge. Poon Decl. Ex. 21 [Rungta Decl.] ¶¶ 22, 28. | Was the final reviewer for many sections of the audit and used judgment to determine which issues should be escalated to the Partner.  Poon Decl. Ex. 8 [Davis Decl.] ¶ 8. |
| Lacked any role in decision-making. Poon Decl. Ex. 25 [Chen Depo.] 119:22-121:3. | Would discuss his decisions with respect to additional testing with the Manager or Partner on the engagement. Poon Decl. Ex. 21 [Rungta Decl.] ¶ 17. | Was often able to make decisions independently; planned and prepared her own fieldwork in high-risk areas. Poon Decl. Ex. 8 [Davis Decl.] ¶¶ 8, 9, 11. |

Plaintiffs also wrongly suggest that the presence of Engagement Leaders and the formation of "audit plans" subject each associate to more than general supervision.  Mot. at 9-11.[26]  Individualized

---

[25]  *See* Poon Decl. Ex. 3 [Botta Decl.] ¶ 13; *id.* Ex. 14 [McClelland Decl.] ¶ 16; *id.* Ex. 22 [Shackley Decl.] ¶ 20 (less supervision on engagements of greater duration); *id.* Ex. 4 [Clarke Decl.] ¶ 11 (worked "more independently" as he became a more experienced Senior Associate).  Mauro Botta notes that, in his experience, "a Senior Associate will likely have more supervision" on a public-company audit, but a Manager is at the client's site less frequently on a private-company audit.  Poon Decl. Ex. 3 [Botta Decl.] ¶ 13.  Senior Associates filling the role of Manager work even more independently than their colleagues do.  For example, Adrienne Davis worked directly under a Partner who was off-site and asked for updates by phone only twice per week.  Poon Decl. Ex. 8 [Davis Decl.] ¶ 7.

[26]  In fact, PwC allows its Engagement Leaders to delegate some of their responsibilities, including the duty to assess team capabilities and performance, directly to Senior Associates.  Plaintiffs'

inquiries would be necessary to determine the extent to which Senior Associates work independently and without close supervision (consistent with PwC policy) "on a daily basis" and create "a work product requiring minimal change" upon a review that is only "after the fact"—*i.e.*, reviews *after* the audit steps were performed.  Poon Decl. Ex. 36 [Senior and Associates Scheduling Process Overview] at 21; *id.* Ex. 32 [Randall Depo.] at 155:3-156:2; *id.* Ex. 33 [Schini Depo.] at 127:11-20; *id.* Ex. 37 [Performance Coaching & Development] at 31.  For example, Plaintiffs cite named Plaintiff Jesse Kenny as an example of a Senior Associate who "never worked without supervision." Mot. at 9.  Even were this true, it would merely provide another example of the extensive and commonality-defeating variation across Plaintiffs' putative class.  As one court aptly stated:

> There is no support for Plaintiffs' overly broad claim that mere review and approval of the class members' work is sufficient to take them outside of the administrative exemption.  Virtually every employee—no matter how high ranking—is subject to some degree of supervision by a superior.  *It is the degree of supervision that is key, and the degree of supervision of class members cannot be determined on common proof because the evidence indicates that they had significantly different experiences.*

*Mekhitarian*, 2009 WL 6057248, at *4 (emphasis added).   The same is true here.  As with Plaintiffs' other purportedly common contentions, the "general supervision" inquiry would necessarily entail thousands of mini-trials in which PwC would have to show, as is its burden on the ultimate merits of liability, what the actual job duties were on an associate-by-associate basis, with outcomes that will turn on the particular associate, audit, and engagement team at issue.[27]

---

Ex. 18.  Before placing a Senior Associate in this managerial role, an Engagement Leader should assess the Senior Associate's capabilities and experience and the complexity of the engagement, *id.*, further demonstrating material differences among putative class members.  Some associates are also involved in the audit planning process and the level of involvement varies from engagement to engagement.  *See* Poon Decl. Ex. 16 [O'Connor Decl.] ¶ 9, 11; *id.* Ex. 9 [Devlin Decl.] ¶ 19; *id.* Ex. 8 [Davis Decl. ¶ 9]; *id.* Ex. 2 [Adams Decl.] ¶ 7.

[27]  Plaintiffs also emphasize PwC's "uniform evaluation processes." Mot. at 3, 11.  But PwC's evaluation framework actually underscores numerous differences among Senior Associates.  For example, PwC rates Senior Associates on how much supervision they need.  Poon Decl. Ex. 36 [Senior and Associates Scheduling Process Overview] at 21.  That criterion would be superfluous if all Senior Associates worked under the same level of supervision.  The evaluation framework may be "uniform" in some abstract sense, but what it demonstrates in reality is significant disuniformity and variation amongst class members.  *Cf. Wal-Mart*, 131 S. Ct. at 2554 ("[I]t is a policy *against having* uniform employment practices.") (original emphasis).

Gibson, Dunn & Crutcher LLP

### b.   Whether Senior Associates Are Primarily Engaged in Work Directly Related to the Management Policies or General Business Operations of PwC or Its Clients (Contention 6)

Other than rehashing contentions that this Court has already rejected, *see infra* Part III.A.2.b, Plaintiffs never explain how class-wide proof could resolve their purportedly common contention that each Senior Associate is not primarily engaged in "work directly related to management policies or general business operations" of PwC or its clients, for purposes of the administrative exemption. Mot. at 19.  Plaintiffs' silence is unsurprising—there is no way this issue could be adjudicated on a class-wide basis.  The claim could be resolved only through numerous individualized inquiries into each Senior Associate's actual duties, how frequently he or she performed those duties each week, and how those duties related to the management policies and general business operations of PwC and of each client with which a particular Senior Associate worked.

As an initial matter, it is clear that when Senior Associates are performing accounting work, they are "practicing within a functional area that is directly related to [the] general business operations" of PwC's clients within the meaning of the administrative exemption.  *Soderstedt*, 197 Cal. App. 4th at 150 (citing 29 C.F.R. § 541.201(b) (2004)).[28]  Similarly, "audit[ing] a client's books and internal processes and develop[ing] recommendations" for the client are activities related to management policies and general business operations.  *Nguyen*, 2009 U.S. Dist. LEXIS 97524, at *17-19 & n.16.  To the extent these issues are common across each Senior Associate, they could only be resolved in PwC's favor, leaving numerous other, individualized inquiries referenced herein.

Moreover, there is variation in the degree and extent to which Senior Associates' accounting and auditing work impacts PwC's clients.  This individualized inquiry will be particularly "fact-intensive," as "[i]t is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business."  *Campbell*, 642 F.3d at 832 (quoting 29 C.F.R. § 541.205(c)(1) (2001) (incorporated by Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(f))).  For example, the size of the engagement and a particular Senior

---

[28]   *See also Harris*, 2011 WL 6823963, at *7 ("auditing" "would normally be considered [an] administrative activit[y]"); *Combs*, 159 Cal. App. 4th at 1256, 1265; *Heffelfinger*, 580 F. Supp. 2d at 950 n.77.

Gibson, Dunn &
Crutcher LLP

Associate's level of experience affect how closely a Senior Associate works with clients' management and whether any given Senior Associate has the opportunity to draft and personally present recommendations to the client.  Poon Decl. Ex. 3 [Botta Decl.] ¶ 9; *id.* Ex. 22 [Shackley Decl.] ¶ 19; *id.* Ex. 32 [Randall Depo.] at 264:15-265:3.  An experienced Senior Associate has "more opportunities to affect a client's business because with experience comes industry knowledge and the ability to spot issues and make recommendations."  Poon Decl. Ex. 22 [Shackley Decl.] ¶ 19; *id.* Ex. 15 [Mijares Decl.] ¶ 12.[29]

Furthermore, some Senior Associates are more successful than others in formulating recommendations that clients ultimately adopt.  *See* Poon Decl. Ex. 37 [Performance Coaching & Development] at 7 (Senior Associates rated as "exceptional" if they "consistently bring new, recognizably value-add ideas to the business" that are then "successfully implemented").  For example, Mike Devlin determined that the client's Senior Vice President of Finance was not sophisticated enough to handle the client's rapid expansion; he made the suggestion to his Manager and the client ultimately replaced that executive with a more sophisticated individual.  Poon Decl. Ex. 9 [Devlin Decl.] ¶ 13; *see also, e.g.*, *id.* Ex. 22 [Shackley Decl.] ¶ 25 (identified a misclassification of a capital lease—which had been missed by the client's previous, non-PwC auditor—that the client corrected in its filings with the SEC); *id.* Ex. 4 [Clarke Decl.] ¶ 9 (noticed an irregularity in the client's financial statements).  To give just one other example, Ashay Dalvi,

---

[29] For example, given his expertise in the media industry, Jim Hooper was staffed as a Senior Associate in a consulting role for a large telecommunications client that had recently acquired several television stations.  Poon Decl. Ex. 13 [Hooper Decl.] ¶¶ 11-15.  Instead of working toward an opinion on the client's financial statements (as is usually the case in an audit), Hooper was tasked with providing advice to the client's internal audit division on media industry practices and recommending to the client how it could reduce the risks of fraud and misstatement.  *Id.*  Hooper "met with the client and suggested how certain job duties should be assigned to separate individuals in different roles and departments."  *Id.*  The client ultimately "took this advice."  *Id.*  Similarly, because of his extensive industry knowledge and position as lead-Senior Associate, Ryan Adams worked directly with the client's CFO and made important recommendations as to whether the client's "puttable" stock (a hybrid security with both equity and debt characteristics) was properly classified, which impacted whether the company was in compliance with certain debt-to-equity covenants that the client had with its lenders.  Poon Decl. Ex. 2 [Adams Decl.] ¶ 16.

1   another unlicensed Senior Associate, identified and recommended a "unique, tailored approach" to

2   calculate a restaurant client's perishable inventory that averted a restaurant shut-down that "would

3   have been costly and bad for business."  Poon Decl. Ex. 7 [Dalvi Decl.] ¶ 10.

4          Given this evidence of individualized and varied impact on the management policies and

5   business operations of PwC's clients, this element could not possibly be resolved on a class-wide

6   basis for each Senior Associate.  Plaintiffs are wrong that Senior Associates' impact on the

7   management policies and business operations of PwC's clients is insufficiently "direct" because they

8   operate in teams of other Attest personnel.  Mot. at 9-10.  To satisfy this element, "an employee . . .

9   need not directly participate in 'the formulation of management policies or in the operation of the

10  business' enterprise as a whole."  *United Parcel Serv.*, 190 Cal. App. 4th at 1030 (quoting 29 C.F.R.

11  § 541.205(c)).  Where "at least some . . . associates and seniors were engaged in work more

12  significant than merely conveying information to their supervisors," individualized issues defeat

13  class-wide adjudication.  *Nguyen*, 2009 U.S. Dist. LEXIS 97524, at *17-19 & n.16.  This is

14  particularly true here, where "the evidence show[s] individual differences" in the degree to which

15  Senior Associates performed "work directly related to management policies or general business

16  operations," and where "at least some associates and senior associates . . . undertook research

17  assignments, performed audits, . . . identified complex [financial] issues . . . for various types of

18  clients and served as a primary client contact. . . ."  *Soderstedt*, 197 Cal. App. 4th at 148.  Again,

19  while some individual Senior Associates might testify to different experiences, there would be no

20  basis for extrapolating from their testimony without altering the underlying law and thus depriving

21  PwC of its due process right to assert its individualized defenses.  *Wal-Mart*, 131 S. Ct. at 2551; *see*

22  *also Novak*, 2011 U.S. Dist. LEXIS 146676, at *14-16.

23         Moreover, before resolving this element of the administrative exemption, a factfinder would

24  also need to assess the extent to which each individual Senior Associate performed work that directly

25  relates to *PwC's* management policies and business operations—another aspect of work that varies

26  across different Senior Associates, at different points in their career, and from week-to-week.  As

27  mentioned above, Senior Associates supervise and coach junior members of their engagement teams,

28

Gibson, Dunn &
Crutcher LLP

29

and some Senior Associates have reported spending 50% or more of their time on these activities.[30]
Poon Decl. Ex. 13 [Hooper Decl.] ¶ 18.  Other Senior Associates staffed their own engagement
teams, which required taking "into account the [associates'] skill set, availability, and experience."
Poon Decl. Ex. 16 [O'Connor Decl.] ¶ 13; *but cf. id.* Ex. 34 [Viller Depo.] at 39:1-5 (never "staff[ed]
an audit" team).  Such duties as "train[ing] . . . and supervis[ing] . . . employees . . . can only
reasonably be characterized as related to the running of [the employer's] general business
operations."  *United Parcel Serv.*, 190 Cal. App. 4th at 1030; *see also, e.g., Bothell v. Phase Metrics,
Inc.*, 299 F.3d 1120, 1128 (9th Cir. 2002); *Hills v. Western Paper Co.*, 825 F. Supp. 936, 937-938 (D.
Kan. 1993).

In addition, some Senior Associates spend significant time recruiting on behalf of PwC "by
taking candidates out to lunch, . . . speaking on campuses, and participating in panel discussions at
the PwC offices," and then providing candidate feedback by "talking directly to the Human
Resources recruiters."  Poon Decl. Ex. 23 [Weatherly Decl.] ¶ 21; *see also id.* Ex. 19 [Piziali Decl.]
¶ 22; *id.* Ex. 4 [Clarke Decl.] ¶ 15.  In addition, Sara Mijares worked on an internal PwC project to
assess issues with "onboarding" (the process of bringing new Associates into the firm) and proposed
solutions to create a smoother onboarding process.  Poon Decl. Ex. 15 [Mijares Decl.] ¶ 15.
"[M]aking recommendations . . . regarding the hiring of new employees and discharge of present
employees, as well as supervising the orientation and training of new office employees . . . constitute
'nonmanual work directly related to management policies' of [the employer] . . . ."  *Lott v. Howard
Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 332 (5th Cir. 2000); *accord, e.g., Fetrow-Fix v.
Harrah's Entm't, Inc.*, 2011 U.S. Dist. LEXIS 133696 (D. Nev. Nov. 16, 2011).  Senior Associates
also interviewed Attest Associate candidates and had a significant voice in determining which
candidates were hired.  *See* Poon Decl. Ex. 29 [Friend Depo.] at 93:16-94:11; *id.* at 102:7-103:25.

---

[30]  Even for Senior Associates who did not spend a majority of their time on this particular exempt
activity, "the Division of Labor Standards Enforcement construes state law . . . to permit the so-
called 'tacking' of one type of exempt work with another type . . . ."  Dept. of Industrial
Relations, DLSE Opinion Letter 2003.05.23, p.5.  "DLSE opinion letters . . . are persuasive
authority."  *Campbell v. PricewaterhouseCoopers, LLP*, 602 F. Supp. 2d 1163, 1169 (E.D.
Cal. 2009).

1  Moreover, some Senior Associates conducted formal training courses for less experienced associates.

2  Poon Decl. Ex. 16 [O'Connor Decl.] ¶ 6 (investment management funds); *id*. Ex. 14 [McClelland

3  Decl.] ¶ 6.  Assessing Senior Associates' involvement with PwC's own management and business

4  operations thus represents yet another inherently individualized inquiry.[31]

5        That the exemption analysis defies common proof is further demonstrated by comparing the

6  testimony of Plaintiff Kress (who worked in the San Diego office) to PwC's declarants, Senior

7  Associates Rungta and Botta (who both worked in the San Jose office):

| Kress | Rungta | Botta |
|---|---|---|
| Never developed a budget for a PwC engagement; only "rolled forward" budgets from previous years.  Poon Decl. Ex. 30 [Kress Depo.] at 361:13-24. | Developed a budget by anticipating changes to the scope of the audit; explained and defended deviations from the budget to the Partner. Poon Decl. Ex. 21 [Rungta Decl.] ¶ 16. | Managed the budget by performing comparative analysis of budgeted figures to actual figures; heavily involved in billing and participated in decisions about the amount and when to bill the client and reported to the client about the costs of the audit.  Poon Decl. Ex. 3 [Botta Decl.] ¶ 17. |
| Indirectly made recommendations to clients only by cutting and pasting audit steps into management comment letters.  Poon Decl. Ex. 30 [Kress Depo.] at 309:20-310:13. | Suggested revisions to client's financial statement disclosures.  Poon Decl. Ex. 21 [Rungta Decl.] ¶ 20. | Provided client with a substantial number of recommendations related to the accounting of its issuance of stock with warrants; after discussing with Partner made recommendations directly to client's CFO.  Poon Decl. Ex. 3 [Botta Decl.] ¶ 12. |
| Conducted "walkthroughs" of clients' internal controls merely by documenting what he observed without evaluating those processes. Poon Decl. Ex. 30 [Kress Depo.] at 424:13-425:6. | Walkthroughs consisted of forming interview questions, analyzing results, and offering recommendations to the client. Poon Decl. Ex. 21 [Rungta Decl.] ¶ 19. | Drafted team's internal controls strategy; considered specific business operations of the client to determine whether the proper controls were being implemented; fielded technical questions from the client's management and made recommendations. |

---

[31]  *See, e.g., Hill v. R+L Carriers*, 2011 U.S. Dist. LEXIS 27997, at *14-15 (N.D. Cal. Mar. 3, 2011) (denying certification in part because of varied degree to which class members made "suggestions and recommendations with regard to hiring decisions").

| | | Poon Decl. Ex. 3 [Botta Decl.] ¶ 9. |
|---|---|---|

In light of this dramatic variation as to the "crucial touchstone" of the exemption inquiry—each "employee's actual job duties and responsibilities," *Campbell*, 642 F.3d at 830—Plaintiffs cannot establish even a single common question concerning those duties and responsibilities.

### c. This Court Has Already Rejected Plaintiffs' Other Contentions Regarding the Administrative Exemption (Contentions 5 and 8).

Equally incapable of "driv[ing] the resolution of this litigation" are two purportedly common contentions that this Court has already rejected—the notion that associates are barred from the administrative exemption by "rules of auditor independence" and on the purported ground that they are mere "production workers." Mot. at 19-20. As to the former, this Court has already explained that rules of auditor independence "do not prohibit" associates from "providing advice or making recommendations to assist the client's management in performing its functions or making decisions." *Campbell*, 253 F.R.D. at 599 n.10; *see also* 29 C.F.R. § 541.207(e)(1) (2001) ("The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action."). Regarding the latter, this Court previously recognized that the administration/production dichotomy is "less than helpful" in examining the administrative exemption, as the regulations themselves "blur[] that dichotomy." *Campbell*, 253 F.R.D. at 599 n.10. There is no reason to depart from that conclusion, particularly now that the California Supreme Court, like numerous other courts, has emphasized the "limitations of the . . . dichotomy as an analytical tool," held that it has been "effectively superseded in this context by the more specific and detailed" provisions of the Wage Order, and cautioned that courts should not "strain to fit the operations of modern-day post-industrial service-oriented businesses" within the dichotomy, which is an "analytical framework formulated in the industrial climate of the late 1940's." *Harris*, 2011 WL 6823963, at *11.[32] Accordingly, the dichotomy cannot circumvent the need to "consider the

---

[32] This echoes the California Court of Appeal's "reject[ion] [of] the suggestion that every enterprise can be subjected to a simplistic parsing of its 'primary' business function for purposes of labeling administrative versus production-level, rank-and-file workers" and disavowal of the dichotomy when, as here, it does not "'clarif[y] the analysis.'" *United Parcel Serv.*, 190 Cal. App. 4th at 1029 (quoting *Bothell*, 299 F.3d at 1127); *see also, e.g.*, *Combs*, 159 Cal. App. 4th at 1260 ("[V]ariations in [plaintiff's] job responsibilities called for 'finer distinctions than the . . .

Gibson, Dunn & Crutcher LLP

particular facts" concerning each Senior Associate's work.  *Id.* at *12.

It is therefore clear that no element of the administrative exemption is susceptible to common proof; therefore, there is no way to resolve Plaintiffs' misclassification claims on a class-wide basis.

### 3. The Remaining Elements of the Professional Exemption Cannot Be Resolved "In One Stroke," Notwithstanding Plaintiffs' Erroneous Assertions of Law.

Though the individualized inquiries inherent in the administrative exemption mean that the Court need not reach the professional exemption at all, trying the ultimate merits of the professional exemption would similarly turn on difficult, fact-intensive, and highly individualized inquiries into the realities of each Senior Associate's "actual job duties."  In contending otherwise, Plaintiffs resort to the same kinds of categorical bars recently rejected by the Ninth Circuit in the related *Campbell* matter, where the Court of Appeals made clear that trying Plaintiffs' claims and PwC's defenses would require the difficult work of actually engaging and grappling with all of the varied and disparate facts governing exemption.  642 F.3d at 827-30.  Plaintiffs' attempts to avoid this task now should be rejected.

### a. Cal. Bus. & Prof. Code § 5053 (Contention 4)

*Campbell* is fatal to Plaintiffs' purportedly common contention that Cal. Bus. & Prof. Code § 5053 limits unlicensed Senior Associates to performing "subprofessional work" for purposes of the professional exemption by requiring them to work under the "control and supervision" of licensed CPAs.  Mot. at 2-3, 19.[33]  The *Campbell* Plaintiffs made essentially the same argument, claiming that Cal. Bus. & Prof. Code § 5053 and AICPA Professional Standards § 311.12 could resolve the question whether associates worked "under only general supervision" for purposes of the administrative exemption, Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(C).  But the Ninth Circuit held

---

administrative/production worker dichotomy provides.'"); *Webster v. Pub. Sch. Employees of Wash., Inc.*, 247 F.3d 910, 916 (9th Cir. 2001) ("The purpose of the dichotomy is . . . not to frustrate the purpose and spirit of the entire exemption."); *Heffelfinger*, 580 F. Supp. 2d at 956.

[33]  Plaintiffs also cite former 29 C.F.R. § 541.308(b), from which they borrow the phrase "subprofessional work."  Mot. at 19.  But that regulation provides no avenue for common proof. It demands an individualized inquiry into "work," and requires "that an employee personally satisfy the requirements of the duties test by virtue of duties actually performed."  *Dingwall v. Friedman Fisher Assocs., P.C.*, 3 F. Supp. 2d 215, 219 (N.D.N.Y. 1998).

Gibson, Dunn &
Crutcher LLP

that "[a]lthough these two provisions tell us Plaintiffs must be supervised, they say nothing about whether that supervision must exceed mere 'general' supervision." *Campbell*, 642 F.3d at 831-32.[34]

If the "control and supervision" requirement of Section 5053 "*say[s] nothing*" about the "general supervision" inquiry under the administrative exemption, it must also "say nothing" about the professional exemption, which does not even have a "supervision" element, nor any other element on which Section 5053 could have any bearing.  The requirement of "control and supervision" "says nothing" about whether any given Senior Associate's work "requir[es] knowledge of an advanced type." *Id.*  It also "says nothing" about whether any given Senior Associate exercises "discretion and independent judgment":  as this Court has recognized, "the fact that the work of PwC associates and senior associates is subject to review is not sufficient to prove that they are performing non-exempt work." *Campbell*, 253 F.R.D. at 602.[35]  Significantly, "discretion and independent judgment" is an element of not only the professional but also the administrative exemption, which *Campbell* held could not be categorically adjudicated on the basis of Section 5053 alone.  642 F.3d at 831-33.  This holding has direct bearing on the class certification issues here because it clarifies the ultimate legal standards governing liability against which this Court must make its evaluation of what differences are *material* for purposes of making its commonality, predominance, and other Rule 23 determinations.  *See supra* Part II.  Consequently, Plaintiffs cannot carry their burden on class certification (and certainly cannot go to the jury) on an argument that is based on a rule that the Ninth Circuit has necessarily held "says nothing" about the issue.  *Campbell*, 642 F.3d at 831-33.

Therefore, all of Plaintiffs' repackaged attempts to argue around *Campbell* are unavailing and cannot possibly "drive the resolution of this litigation."  *Wal-Mart*, 131 S. Ct. at 2551.

      **b.**      **Whether Senior Associates Are Primarily Engaged in an Occupation That Is Commonly Recognized As a Learned Profession (Contention 2)**

Numerous individualized inquiries would also be necessary to resolve Plaintiffs' second

---

[34] *See also, e.g.*, *Soderstedt*, 197 Cal. App. 4th at 151 (Section 5053 did not obviate the need for an individualized inquiry into the level of supervision afforded to individual accountants).

[35] *See also, e.g.*, *Mekhitarian*, 2009 WL 6057248, at *5 ("review[] . . . does not mean that [employees] failed to exercise discretion and independent judgment"); 29 C.F.R. § 541.207(e)(1) (2001); *supra* Part III.A.1.b.

Gibson, Dunn &
Crutcher LLP

Case No. 2:08-cv-00965 – LKK/GGH
DEFENDANT'S MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION

purportedly common question—whether Senior Associates are primarily engaged "in an occupation that is commonly recognized as a learned profession" for purposes of the professional exemption, Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(b).  Mot. at 19.  Although Plaintiffs suggest otherwise, this question cannot be answered in the abstract by inquiring into whether an occupation is generally viewed as "learned."[36]  *See id.*  Rather, the term "learned . . . profession" is a term of art, specifically defined by the Wage Order itself to include employees who are "primarily engaged in the performance" of "work" that is "predominantly intellectual and varied in character" and "work" requiring advanced knowledge.  Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(b)(i), (iii).

The question whether the work being performed by each Senior Associate is "predominantly intellectual and varied"—which Plaintiffs ignore—is necessarily individualized.  Plaintiffs attempt to characterize their own work as uniformly rote.  Poon Decl. Ex. 30 [Kress Depo.] at 446:10-16 (part of his job was "[s]eeing if two numbers are the same number"); *id.* at 439:14-441:23 (when he communicated with clients he read directly from a script).  But one of Plaintiffs' own declarants freely admits that whenever she sought new and challenging work, her engagement team was accommodating, Poon Decl. Ex. 24 [Bonilla Depo.] at 370:4-22; *see also id.* Ex. 22 [Shackley Decl.] ¶ 17 (some Senior Associates "take on tasks that require greater responsibility" while others "shy away from extra responsibilities").  And numerous other Senior Associates described performing duties that were clearly "intellectual" in nature.  For example, Mauro Botta specialized in auditing telecommunications companies and designed a new audit procedure for his client, Poon Decl. Ex. 3 [Botta Decl.] ¶ 10, while Brian Shackley oversaw Senior Associates who developed new audit approaches to account for innovations in the video game industry, *id.* Ex. 22 [Shackley Decl.] ¶ 21; *see also id.* Ex. 20 [Rashid Decl.] ¶ 18 (analyzed U.S. treaties to determine a foreign capital gains tax).  At least some of this work clearly qualifies as "intellectual and varied," insofar as "project[s] [the employee] worked on required different applications" of certain "over-arching standards," and

---

[36]  Public accountants are clearly eligible for this aspect of the exemption, depending on the facts, as the Wage Order defines "accounting" as a "recognized profession[]."  *Campbell*, 642 F.3d at 826-28; Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(a); *see also Mekhitarian*, 2009 WL 6057248, at *3 ("public accountancy is certainly a subset of the 'learned profession' of accounting"); *accord* 29 C.F.R. § 541.301(c) (2004).

the "intellectual skills required" to perform any given project "varied depending on the needs of the client and the number of people working on the project." *Medepalli v. Maximus, Inc.*, 2008 WL 958045, at *6 (E.D. Cal. Apr. 8, 2008).[37]  Underscoring this variation is Ryan Adams's observation that "I tested different and more complicated accounts than the other Senior Associate [on my team]," which resulted in further differences in the work that we performed because we were required to apply different accounting standards and perform different types of analyses."  Poon Decl. Ex. 2 [Adams Decl.] ¶ 19.

Because Plaintiffs provide no basis to extrapolate from their own testimony about the experiences of other class members, attempting to resolve this element would require each individual Senior Associate to be examined about his or her duties in any given workweek.  *Wal-Mart*, 131 S. Ct. at 2561; *Marlo*, 639 F.3d at 948; *Cruz*, 2011 WL 2682967, at *4, 7-8; *see also, e.g.*, *Mekhitarian*, 2009 WL 6057248, at *4 ("given the large weight of evidence that [plaintiffs] have a broad range of duties and responsibilities, this determination would require case-by-case analysis and would not be amenable to common proof").  Such individual-by-individual, workweek-by-workweek analysis is plainly necessary to determine whether any given Senior Associate is "*primarily*" engaged in work that is "*predominantly* intellectual and varied in character."  Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(b)(iii) (emphases added); *see generally Marlo*, 639 F.3d at 948.

      **c.**     **Work Requiring Knowledge of an Advanced Type (Contentions 1 and 3)**

The "work-knowledge" element similarly turns on the actual work that any given Senior Associate performs in any given workweek, and therefore it too is not amenable to common proof.

      **(i)**     **Each Individual Employee's "Work" Is the "Crucial Touchstone" of the Professional Exemption, Including Its Work-Knowledge Requirement.**

Plaintiffs characterize their first purportedly common question as whether the "instruction and

---

[37]  *See also Medepalli*, 2008 WL 958045, at *6 ("[L]ike a doctor performing similar tests to diagnose different diseases and recommend different treatments, the computer codes and applications Medepalli developed were unique to the needs of each of Maximus' clients"); 29 C.F.R. 541.306(a) (2001) ("[A]lthough a professional chemist may make a series of similar tests, the problems presented will vary as will the deductions to be made therefrom . . . even though similar outward actions may be performed.").

study necessary for hire" is sufficiently specialized for purposes of the professional exemption.  Mot. at 19.  That is not the pertinent question.  The professional exemption turns on the "*work*" in which each employee is primarily engaged—an individualized, threshold inquiry that cannot be avoided by resort to hiring policies.

By its plain terms, the professional exemption requires (among other things) that employees be "primarily engaged" in "*[w]ork requiring knowledge of an advanced type in a field or science or learning customarily acquired* by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship." Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(b)(i) (emphases added).  As the Ninth Circuit held in *Campbell*, the "crucial touchstone" of the professional exemption is an examination of what "*work*" each individual employee is primarily engaged in—that is, an individual employee's "actual job duties and responsibilities," and the knowledge required to perform those duties and responsibilities.  642 F.3d at 827 (emphasis added).[38]  As a matter of logic, the question of how "knowledge" is "customarily acquired" cannot be answered without first determining *what kind of "knowledge" is "requir[ed]" by the work each individual employee does* at any given point in his or her career.  And a factfinder cannot determine which work to examine in the first place without conducting individualized inquiries into what kind of work *each employee* is *primarily engaged in*.  Additionally, a factfinder would have to conduct numerous individualized inquiries concerning which work of each employee "is an essential part of or necessarily incident to any" work requiring advanced knowledge, because the professional exemption also encompasses such work.  Cal. Code Regs. tit. 8,

---

[38] This Court's prior construction of the professional exemption "focuse[d] on whether the individual is employed in a qualifying *occupation*."  *Campbell*, 253 F.R.D. at 598 (emphasis added).  The Ninth Circuit, however, has now held that the professional exemption "frames its application in terms of *individual employees*, rather than whole professions," and depends on an employee's "*actual job duties*."  *Campbell*, 642 F.3d at 826 (emphases added).  The necessary inquiry into each employee's actual job duties thus resolves this Court's prior concern that the professional exemption could be an inherently common inquiry.  *Campbell*, 253 F.R.D. at 598.  As the record here shows, two colleagues could very well perform different "work" in any given week, if not in every week, and thus they could be primarily engaged in different "occupation[s]" for purposes of the Wage Order.  Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(b), (b)(i).

Gibson, Dunn & Crutcher LLP

1    § 11040(1)(A)(3)(b)(i).  These inquiries would require a factfinder to assess the percentage of time

2    each employee spent performing various tasks, and also to carefully examine whether certain tasks

3    were "an essential part of or necessarily incident to" *other* work.  Cal. Code Regs. tit. 8,

4    § 11040(1)(A)(3)(b)(i).  "Thus, *each case* will require a fact-specific inquiry into whether the

5    unlicensed accountant meets the [exemption's] various benchmarks."  *Campbell*, 642 F.3d at 827

6    (emphasis added); *see also Mekhitarian*, 2009 WL 6057248, at *3 (where employees "engage in

7    work that varies . . . the applicability of the learned professional exemption cannot be determined

8    with common evidence").  The professional exemption nowhere sanctions Plaintiffs' attempt to rely

9    exclusively on PwC's hiring policies—and to ignore the work each Senior Associate actually does.

10           The wide variation in Senior Associates' actual job duties (discussed above) demonstrates

11   why the professional exemption's work-knowledge requirement in particular necessitates an analysis

12   of an individual's actual work as the threshold inquiry.  For example, Plaintiff Brandon Kress has

13   claimed that as a Senior Associate, he exercised minimal discretion on the job, and that someone with

14   only a high school education could have completed most of his tasks.[39]  Even were that true,

15   numerous other Senior Associates performed complicated work involving significant discretion,

16   creativity, and analysis—work they could not have performed without extensive accounting-related

17   training and education.  Ashay Dalvi testified that "even [his] complex work as a Senior Associate"

18   drew upon accounting rules learned in college.  Poon Decl. Ex. 7 [Dalvi Decl.] ¶ 3; *see also id.*

19   Ex. 23 [Weatherly Decl.] ¶ 5.  On some engagements, Brian Shackley noticed "college-level

20   accounting textbooks in the team room" and observed that "auditors from Associate to Partner-level

21   use these books as a reference."  Poon Decl. Ex. 22 [Shackley Decl.] ¶ 4; *see also, e.g., id.* Ex. 6

22   [Crane Decl.] ¶ 6.  Even Ms. Kenny praised an Associate in a performance review for "referr[ing] to

23   his accounting book in order to ensure his calculations were correct."  Maryott Decl. Ex. S12

24   [Performance Review of Associate A] at 2 (p.55 in pdf); *see also, e.g.*, Poon Decl. Ex. 32 [Randall

25   Depo.] at 106:12-19 ("If you're doing a test, you would apply the different testing methods . . . that

26

27   _____

28   [39]  Poon Decl. Ex. 30 [Kress Depo.] at 443:5-10 ("[R]eading a questionnaire and checking a list, and
         maybe a monkey—you know, a high school student—that's a better example . . . could have done
         this."); *see also id.* Ex. 28 [Kenny Depo.] at 395:15-396:5.

Gibson, Dunn &
Crutcher LLP

you learned from school."); *id.* Ex. 24 [Bonilla Depo.] at 92:2-12 (referred to college accounting

book while auditing clients).  Shackley credits his own accounting education for developing "an

intuition that I now apply on the job."  That education helps him "recognize when something in a

client's accounting records doesn't look right" and determine whether he must "dig deeper for further

details."  Poon Decl. Ex. 22 [Shackley Decl.] ¶ 4.  Ryan Adams states that he "could not have

performed [his] audit work at any point in [his] career at PwC without the accounting education that

[he] received in college."  Poon Decl. Ex. 2 [Adams Decl.] ¶ 5; *see also, e.g., id.* Ex. 6 [Crane Decl.]

¶ 6 (accounting education was "fundamental" to performing duties as a Senior Associate).  These

differences illustrate that Senior Associates performed different types of work, and thus that the

knowledge their work required also differed materially.

Moreover, the individualized inquiries concerning employees' work would only be the first

step—a factfinder would still need to sort through Senior Associates' varied educational backgrounds

and continuing education courses to ascertain how the knowledge required to do each particular type

of work is "customarily acquired."  Here, the evidence shows that while each Senior Associate's

training directly relates to accounting, "because the putative class members have a wide variety of

advanced degrees, certificates, and training that they use in the performance of their . . . audit job

duties, . . . individual questions predominate over common issues."  *Nguyen*, 2009 U.S. Dist. LEXIS

97524, at *27.  This variation is apparent from the testimony of Plaintiff Kress and PwC's declarants,

Desmond Clarke and Ryan Adams:

| Kress | Clarke | Adams |
|---|---|---|
| Only a high school education was necessary for most of his tasks. Poon Decl. Ex. 30 [Kress Depo.] at 417:13-18. | "Frequently drew upon . . . undergraduate accounting classes" particularly when auditing capital leases. Poon Decl. Ex. 4 [Clarke Decl.] ¶ 4. | "[F]requently relied on [his] accounting knowledge to make the initial assessment, which is often the most crucial one." Poon Decl. Ex. 2 [Adams Decl.] ¶ 5. |
| Does not recall if he took any optional coursework. Poon Decl. Ex. 30 [Kress Depo.] at 332:9-14. | Took optional, "18-hour self-study course . . . to differentiate [himself from] peers when dealing with clients whose business included derivatives." Poon | Took "ownership of [his] professional development" and the "bulk" of his training was elective courses aimed at furthering his specialized audit work. Poon Decl. Ex. 2 |

Gibson, Dunn &
Crutcher LLP

| | Decl. Ex. 4 [Clarke Decl.] ¶ 6 | [Adams Decl.] ¶ 23. |
|---|---|---|
| No discernable expertise in a specific audit area.  Poon Decl. Ex. 30 [Kress Depo.] at 304:7-307:17. | "[W]as primarily focused on auditing clients in the banking sector."  Poon Decl. Ex. 4 [Clarke Decl.] ¶ 3. | Learned so much about the construction industry that he developed his own training program that he presented to his audit team.  Poon Decl. Ex. 2 [Adams Decl.] ¶ 12. |

Therefore, in characterizing the dispute as solely concerning what is "necessary for hire" at

PwC, Plaintiffs' first purportedly common question misses the *threshold* question of what "work"

any given Senior Associate is primarily engaged in during those weeks in which they work more than

40 hours.  *Campbell*, 642 F.3d at 830.[40]  The resolution of that issue, like others, necessitates

"myriad" individualized inquiries.

> **(ii)    Plaintiffs' Contentions Also Cannot Survive the "Rigorous Analysis" Mandated by the Supreme Court in *Wal-Mart*.**

Plaintiffs' purportedly common contentions concerning the professional exemption also fail to

satisfy the requisite "rigorous analysis" mandated by *Wal-Mart*.  Even if hiring policies ever could

substitute for the need for individualized analysis of the *work* performed on the ground that the

policies did not call for a sufficiently specialized course of learning (which they cannot, *see supra*

---

[40] Contrary to Plaintiffs' suggestion, Mot. at 6, the need to first examine each employee's *work* is unaffected by *Solis v. State of Washington, Dep't of Soc. & Health Servs.*, 656 F.3d 1079, 1081 (9th Cir. Sept. 9, 2011).  *Solis* reversed a grant of summary judgment for an employer that had relied on minimum hiring requirements in support of its argument under the professional exemption; the court did not consider whether any differences in the work performed by each plaintiff were so material as to have made resort to a purportedly common set of policies a futile exercise in the first place, as here.  *Id.* at 1087.  Indeed, if *Solis* did conflict with *Campbell*'s holding that the "crucial touchstone" of the professional exemption is "work" (and not hiring policies), *Campbell* would control as the earlier-decided case, as a Ninth Circuit panel may not depart from prior panel precedent absent intervening en banc or Supreme Court authority.  *Benny v. United States Parole Comm'n*, 295 F.3d 977, 983 (9th Cir. 2002).

Moreover, reading *Solis* to preclude any inquiry beyond any minimum educational prerequisites set by the employer would lead to absurd results.  For example, a law firm may hire new associates without requiring that they graduate from law school, but such associates would surely be exempt because the knowledge needed for the legal "work" they do is customarily acquired in law school.  29 C.F.R. § 541.301.  In short, hiring prerequisites cannot substitute for individualized inquiries—*first* regarding the work actually performed and, *second*, regarding the knowledge required to do that work.

Gibson, Dunn & Crutcher LLP

Part III.A.3.c.i), *PwC*'s hiring policies provide no such easy way out, and certainly it cannot be said that they "will resolve" the exemption issue. *Wal-Mart*, 131 S. Ct. at 2551. Unlike in *Solis*, 656 F.3d 1079, 1087-88, PwC examines the relevant courses of study at issue here to ensure that they are *directly* tailored to audit work. PwC expects associates to have either an accounting degree or enough coursework to be eligible to sit for the CPA examination—*i.e.*, twenty-four semester units in accounting subjects and an additional twenty-four semester units of business-related subjects.[41] Poon Decl. Ex. 33 [Schini Depo.] at 96:17-21, 97:3-11; *see also id.* Ex. 22 [Shackley Decl.] ¶ 4 (Bachelor's degree in Finance, but before starting at PwC took the requisite number of accounting courses at night). In fact, many associates have either a Master's degree in accounting or a Bachelor's degree with a major or concentration in accounting. *See, e.g.*, Poon Decl. Ex. 16 [O'Connor Decl.] ¶ 4 (Master's degree in Accounting); *id.* Ex. 13 [Hooper Decl.] ¶ 5 (same); *id.* Ex. 23 [Weatherly Decl.] ¶ 5 (Bachelor's degree in Accounting); *id.* Ex. 2 [Adams Decl.] ¶ 4 (same).[42] Associates also must have passed the CPA exam to be promoted to Senior Associates, Poon Decl. Ex. 33 [Schini Depo.] at 133:14-15; *id.* Ex. 39 [FY11 ARC Guidance Assurance Addendum] at 6, and regardless of licensure they are required by PwC to comply with CPA continuing education requirements, including a minimum of 120 hours of continuing education every three years. *See* Poon Decl. Ex. 35

---

[41] Qualifying accounting subjects include Accounting, Auditing, External or Internal Reporting, Financial Reporting, Financial Statement Analysis, Taxation, Assurance, Attestation, Bookkeeping, Cost Analysis, Quickbooks, and CPA review courses. Qualifying business-related subjects include Business Administration, Business Communications, Business Law, Business Management, business-related law courses, Computer Science/Information Systems, Economics, Finance, Marketing, Mathematics, and Statistics. Cal. Code Regs. tit. 16, § 9.2(b); Cal. Bd. of Accountancy, Uniform CPA Examination Handbook 4 (2011).

[42] Even if Plaintiffs were able to identify putative class members who do not have an accounting or business degree, that would not change the analysis. The Wage Order asks how the knowledge required for the employee's work is "customarily acquired," and does not preclude exemption simply because an employer does not require a particular academic degree without exception and in every single case as an absolute prerequisite for hire. *See, e.g.*, Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(i); 29 C.F.R. § 541.301(d) (2001), *incorporated by* Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(e); 69 Fed. Reg. 22,122, 22,151 (April 23, 2004) (citing *Leslie v. Ingalls Shipbuilding, Inc.*, 899 F. Supp. 1578, 1582 (S.D. Miss. 1995)).

Gibson, Dunn & Crutcher LLP

[CPE Requirements]; *id.* Ex. 33 [Schini Depo.] at 136:25-137:4.[43]   Additionally, PwC offers a wide

array of continuing education courses—approximately 2,800—only a tiny slice of which constitute

the mandatory "annual independence and ethics training" that Plaintiffs baselessly trumpet as

evidence of supposed homogeneity.  Mot. at 7.  These courses are often taken before an Associate is

promoted to Senior Associate, and different Senior Associates also often choose different courses

based on the engagements, industries, and audit issues on which they are working.  *E.g.*, Poon Decl.

Ex. 13 [Hooper Decl.] ¶ 9 (took training course on auditing stock-based compensation to help him on

an upcoming engagement); *id.* Ex. 4 [Clarke Decl.] ¶ 6 (took 18-hour course in auditing derivatives

to "differentiate [himself from his] peers when dealing with clients whose business included

derivatives"); *id.* Ex. 9 [Devlin Decl.] ¶ 6 (chose trainings to take based on their relevance to his

practice); *see also id.* Ex. 31 [Morey Depo.] at 45:8-46:7.  When reviewing an Associate, Ms. Kenny

"recommended that he take industry specific training to familiarize himself with the accounting

literature and applicable guidance that surrounds the industry."  Maryott Decl. Ex. S13 [Performance

Review of Associate B] at 2 (p.20 in pdf).  Contrary to Plaintiffs' assertion that Senior Associates are

"subject to uniform job training," Mot. at 3, in fact "Attest Senior Associates' training regimens vary

significantly from employee to employee."  Poon Decl. Ex. 43 [Hewlett Decl.] ¶ 11.  That is not

surprising because PwC currently offers over 2800 courses to its Senior Associates in Assurance.  *Id.*

at ¶ 5.  Among those courses are "over 100 industry and sector-specific trainings" that PwC currently

offers to its Attest Senior Associates in California that focus on "the different industries, sectors and

---

[43]   Importantly, licensed and unlicensed Senior Associates work side-by-side at PwC, and licensure does not affect job duties or responsibilities.  Poon Decl. Ex. 22 [Shackley Decl.] ¶ 5; *id.* Ex. 13 [Hooper Decl.] ¶ 7.  In fact, partners do not even know which Senior Associates on their engagement teams are licensed.  Poon Decl. Ex. 33 [Schini Depo.] at 22:9, 129:20-23; *id.* Ex. 22 [Shackley Decl.] ¶ 5 (only HR and his mentor were aware of his license status); *see also* 29 C.F.R. § 541.301(e)(5) (2004) ("Certified public accountants generally meet the duties requirements for the learned professional exemption" and "many other accountants who . . . perform similar job duties may qualify as exempt learned professionals.").  Not all Senior Associates have obtained an actual CPA license, because some are still fulfilling experience requirements and others have fulfilled the requirements but have applications pending with a state licensing board.  *See* Poon Decl. Ex. 33 [Schini Depo.[ at 133:21-134:6; *id.* Ex. 4 [Clarke Decl.] ¶ 5 (met all requirements but did not submit application because he saw no benefit); *id.* Ex. 13 [Hooper Decl.] ¶ 6 (received CPA license in Washington then moved to Los Angeles office; worked as a Senior Associate for another three years before getting California license).

Gibson, Dunn &
Crutcher LLP

1   subsectors served by PwC and their unique accounting issues." *Id.* at ¶ 10-11. And course offerings

2   change over time, so a Senior Associate in 2006 would not have taken the same courses as a Senior

3   Associate in 2011. *See id.* ¶ 15.

4         Plaintiffs also cannot avoid the need for individualized inquiries concerning each Senior

5   Associate's work by distorting counsel's comparison of Attest Associates to "apprentice[s]." Mot.

6   at 6. This comment, quoted out of context, was made by counsel at a summary judgment hearing,[44]

7   and Plaintiffs cite *no evidence* whatsoever that any Associate is in fact a mere "apprentice." And

8   under the plain language of the Wage Order, the advanced knowledge is sufficient so long as it is

9   customarily acquired by "a prolonged course of specialized intellectual instruction and study," "*as*

10  *distinguished from*" an "apprenticeship." Cal. Code Regs. tit. 8, § 11040(1)(A)(3)(b)(i) (emphasis

11  added); *see also, e.g.*, 29 C.F.R. § 541.301(b), (d) (2001) ("[T]he exemption is also available to

12  employees . . . who attained the advanced knowledge through a combination of work experience and

13  intellectual instruction."). In other words, an apprenticeship is an insufficient source of advanced

14  knowledge only when it is the *sole* source of the knowledge required for the "work" at issue. But

15  there is no evidence that experience as an Attest Associate is ever a Senior Associate's *sole* source of

16  knowledge, and that experience in no way substitutes for the specialized undergraduate, graduate, and

17  continuing courses of education through which Senior Associates customarily acquire the knowledge

18  needed to perform their work. And in any event, *Campbell* foreclosed this contention in holding that

19  the factual disputes concerning what "work" each Associate performed made it impossible to

20  categorically adjudicate the professional exemption based purely on a characterization of Associates'

21  work as an apprenticeship. 642 F.3d at 820; *see also* Poon Decl. Ex. 41 [Pls.' Opp. on App.] at 37-

22  38; *id.* Ex. 42 [Trans. of Feb. 15, 2011 Oral Argt.] at 19:22-20:25, 25:5-13; *Mekhitarian*, 2009 WL

23  6057248, at *3 ("[Although] some proposed class members could be categorized as learning the

24  profession, given . . . [their] broad range of duties and responsibilities, this determination would

---

44   Counsel's point was simply that it is not unusual for professionals to fulfill some sort of
     experience requirement before they become licensed, during which time they perform
     professional work. Poon Decl. Ex. 40 [Excerpts from hearing in *Campbell v.
     PricewaterhouseCoopers LLP*, No. S-06-2376 LKK (E.D. Cal. Feb. 20, 2009)].

1    require case-by-case analysis . . . .").

2         Therefore, none of Plaintiffs' purportedly common contentions "will resolve" the applicability

3    of the professional exemption, *Wal-Mart*, 131 S. Ct. at 2551, because they cannot avoid the need to

4    examine the work that each individual Senior Associate performed during any given workweek.

5         **4.    Common Issues Do Not Exist, Much Less Predominate.**

6         In sum, Plaintiffs are demonstrably wrong that they have established "multiple common

7    questions" warranting certification of their putative class.  Mot. at 15 n.15.  Plaintiffs' claim of

8    commonality is defeated because their evidence cannot account for the numerous declarants already

9    before this Court even on this limited record who indisputably were primarily engaged in exempt

10   work during many, if not most, workweeks.  Not a single one of Plaintiffs' purportedly common

11   issues can account for these exempt Senior Associates or is capable of resolving either exemption at

12   issue in this litigation "in one stroke"—let alone "each" exemption.  *Wal-Mart*, 131 S. Ct. at 2551;

13   *Nguyen*, 2009 U.S. Dist. LEXIS 97524, at *8.[45]  Even if any were, common issues would not

14   predominate given the numerous individualized inquiries needed to adjudicate the others.  *See, e.g.*,

15   *Nguyen*, 2009 U.S. Dist. LEXIS 97524, at *7-8; *Novak*, 2011 U.S. Dist. LEXIS 146676, at *18-20.

16   Indeed, even if "element[s] of *each* exemption [could] be adjudicated through common proof on a

17   class wide basis," class certification would still be inappropriate because "[t]he question is not

18   whether the putative class has at least one issue in common, but whether common 'questions of law

19   or fact . . . *predominate* over any questions affecting only individual members.'"  *Nguyen*, 2009 U.S.

20   Dist. LEXIS 97524, at *8.  The predominant issue—the "crucial touchstone"—of this matter is the

21   actual duties performed on a day-to-day, week-to-week, and audit-to-audit basis by each Senior

22   Associate, necessitating a "fact-intensive, individualized inquiry *anathema* to Rule 23(b)(3)."  *Morse*,

23   2011 U.S. Dist. LEXIS 50920, at *8 (emphasis added).  Predominance is lacking because "the

24   policies about which [Plaintiffs] complain[]—do[] not answer the ultimate question in the case."

25   *Pryor*, 2011 U.S. Dist. LEXIS 150276, at *48; *Velazquez*, 2011 WL 4891027, at *7.  Plaintiffs have

26   _____

27   [45]  Plaintiffs also recite several tag-along issue statements, Mot. at 3, 20-21, but these cannot
          establish commonality or predominance as they are unaccompanied by any real attempt to
28        generate "common answers."  *Wal-Mart*, 131 S. Ct. at 2551.

1    therefore failed to carry their "burden [under] Rule 23."  *Marlo*, 639 F.3d at 947-48.

2    **B.    Common Issues Do Not Exist, Nor Predominate, With Respect to Plaintiffs' Meal-Period and Rest-Break Claims.**

3
4           This Court need not even separately consider the certifiability of Plaintiffs' meal- and rest-

5    period claims unless it were to conclude that Plaintiffs have carried their burden under Rule 23 on

6    their predicate misclassification claims (which they have not), as the meal-period and rest-break

7    "claims are available only to those putative class members who are found to be nonexempt."  *E.g.*,

8    *Nguyen*, 2009 U.S. Dist. LEXIS 97524, at *6 & n.3; Cal. Code Regs. tit. 8, § 11040(1)(A).  But

9    separate and apart from the numerous and fatal defects in Plaintiffs' case for class certification of

10   their misclassification claims, Plaintiffs' meal-period and rest-break claims likewise lack a common

11   contention that could resolve them on a class-wide basis.  The plain language of California Labor

12   Code Sections 226.7 and 512 requires that an employer "provide" an employee meal and rest breaks,

13   and therefore makes clear that meal and rest breaks need only be made available.[46]  Numerous courts

14   have so held and have noted the public policy and common sense reasons favoring such a plain-

15   meaning interpretation.[47]

16          Therefore, PwC could only be liable if it did not "make available"—but instead *prevented*—

17   the breaks from being taken.  Such an inquiry, however, would be inherently individualized, as

18   numerous courts have recognized.  *See supra* note 47.  The absence of a policy concerning meal and

19   rest breaks "would not preclude the need to examine whether such breaks were in fact made available

20   to the individual" members of the putative class.  *Wong*, 2011 U.S. Dist. LEXIS 125988, at *18 n.11.

21   "That question—which is a key question—cannot be answered on a class-wide basis."  *Id.*[48]

22   _____

23   [46] An authoritative resolution of this issue by the California Supreme Court is expected soon in *Brinker v. Superior Court*, S166350 (Cal. argued Nov. 8, 2011).

24
25   [47] *See, e.g.*, *Wren v. RGIS Inventory Specialists*, 256 F.R.D. 190, 208 (N.D. Cal. 2009); *Brown v. Fed. Exp. Corp.*, 249 F.R.D. 580, 586 (C.D. Cal. 2008); *Kenny v. Supercuts, Inc.*, 252 F.R.D. 641, 646 (N.D. Cal. 2008); *White v. Starbucks Corp.*, 497 F. Supp. 2d 1080, 1089 (N.D. Cal. 2007).

26
27   [48] Even if employers had to do something more than make available meal and rest breaks, the requisite inquiry would still be inherently individualized.  Poon Decl. Ex. 22 [Shackley Decl.] ¶ 27 (break policies "varied with the nature and size of the engagement team," and some supervisors ensured that Senior Associates took adequate, non-working breaks); *see also id.*

28

Gibson, Dunn & Crutcher LLP

**C.    Plaintiffs Are Neither Typical Nor Adequate Class Representatives.**

Plaintiffs have also failed to carry their burden to prove typicality under Rule 23(a)(3) or adequacy under Rule 23(a)(4). These requirements "tend to merge" with commonality. *Wal-Mart*, 131 S. Ct. at 2551 n.5. They all "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* Therefore, Plaintiffs' attempts to prove typicality and adequacy also fail due to the "'extensive differences in . . . job duties . . . and other key differences' pertinent to an adjudication of, at the very least, [PwC's] defenses to . . . [Plaintiffs' misclassification] allegations. . . ." *Drake*, 2010 WL 2175819, at *5 (citation omitted). "Plaintiffs cannot establish typicality because, given that there was nothing typical about how the … job was carried out, Defendants' treatment of [the named plaintiffs] or the other [putative class members] could similarly not have been 'typical.'" *Id.* Specifically, Mr. Kress's and Ms. Kenny's audit experience was narrow—both testified to no experience whatsoever in most of the industries and audit areas in which thousands of Senior Associates work. *See* Poon Decl. Ex. 30 [Kress Depo.] at 304:7-307:17; *id.* Ex. 28 [Kenny Depo.] at 346:2-15, 347:1-348:22. As this Court has recognized, where the named plaintiffs "have virtually no knowledge" about what other associates do, certification of a broad class is not "appropriate." *Campbell*, 253 F.R.D. at 595-96 (citing *Kelley v. SBC, Inc.*, 1998 U.S. Dist. LEXIS 18643, at *43 (N.D. Cal. Nov. 13, 1998) (limiting certification to positions plaintiffs actually held)); *Ho*, 2011 WL 4403625 , at *3 (N.D. Cal. Sept. 20, 2011) ("named plaintiffs cannot represent employees who worked in different lines and different positions").

Moreover, Mr. Kress and Ms. Kenny are subject to "unique defenses that disqualify them from acting as class representatives" because of "significant questions about the[ir] competence, if not the[ir] integrity," which "might well cause a fact finder to 'focus on [Plaintiffs'] credibility to the detriment of the absent class members' claims.'" *Evans*, 244 F.R.D. at 578 (quoting *Wang v. Chinese Daily News, Inc.*, 231 F.R.D 602, 609–10 (C.D. Cal. 2005)). First, Mr. Kress and Ms. Kenny's

---

Ex. 32 [Randall Depo.] at 279:20-280:9; *id.* Ex. 28 [Kenny Depo.] at 267:13-24 (break practices varied depending on whether it was busy season).

testimony that they "never worked" at PwC "under minimal supervision," Poon Decl. Ex. 27 [Kenny Depo.] at 45:23-46:5; *accord id.* Ex. 29 [Kress Depo.] at 131:19-132:12, is contradicted by countless performance reviews.[49]  Second, try as they might to deny that PwC associates ever apply accounting principles or standards to their work, Poon Decl. Ex. 27 [Kenny Depo.] at 138:4-20; *id.* Ex. 29 [Kress Depo.] at 96:21-97:1, 114:15-20, their performance reviews and their own reviews of subordinates tell an entirely different story.[50]  Importantly, a "court need not resolve the issue of credibility . . . in order to bar class certification.  It is enough to note the existence of a credibility problem and its potential adverse impact on the class."  *E.g.*, *Wagner v. Lehman Bros. Kuhn Loeb, Inc.*, 646 F. Supp. 643, 660-61 (N.D. Ill. 1986).

Other unique defenses further defeat the named plaintiffs' adequacy and typicality because they pose the "danger that absent class members will suffer if their representative is preoccupied." *Ellis*, 657 F.3d at 984.  For example, Ms. Kenny was rated by PwC as an "exceptional" performer. Maryott Decl. Ex. S8 [Kenny Depo. Ex. 25] at 11.[51]  PwC thus can raise numerous individual

---

[49]  *See* Maryott Decl. Ex. S8 [Kenny Depo. Ex. 25] at 10 (stating that Kenny works well and delivered an excellent product with limited supervision); *id.* Ex. S9 [Kenny Depo. Ex. 28] at 5 (Kenny worked very independently with no need for direct supervision); Poon Decl. Ex. 29 [Kress Depo.] at 198:7-19 (Kress would meet with the client with little or no supervision); *id.* at 226:10-22 (stating that Kress was able to document work with little or no supervision).  Ms. Kenny has attested to the accuracy of her performance reviews.  Poon Decl. Ex. 27 [Kenny Depo.] at 215:21-216:8; *id.* Ex. 28 [Kenny Depo.] at 424:2-5 ("No, I don't refute those reviews.").

[50]  *See* Maryott Decl. Ex. S14 [Performance Review of Associate C] at 6 ("[C] exceeded my expectations in many areas, including application of accounting principles."); *id.* Ex. S7 [Kenny Depo. Ex. 22] at 47 (review praising Ms. Kenny for independently researching issues and applying accounting principles); Poon Decl. Ex. 29 [Kress Depo.] at 205:11-18 (review stated that Kress was able to apply accounting principles and identify issues).  Mr. Kress also admits that his Linked-in profile is "misleading," *id.* Ex. 30 [Kress Depo.] at 361:13-24, and that his resume's description of his PwC work experience and performance was "inaccurate," *id.* Ex. 29 [Kress Depo.] at 20:22-21:9, 26:1-11; *see also id.* at 82:12-16; Maryott Decl. Ex. S11 [Kress Depo. Ex. 3].

[51]  Indeed, reviewers noted that Ms. Kenny possessed the most professional skepticism that they had seen at her level, that she was the main contact on-site with the client with limited supervision, that she performed at a level higher than her peers, that her performance was stronger than we could have asked for, and that she was the most important player on an engagement team. Maryott Decl. Ex. S7 [Kenny Depo. Ex. 22] at 47, Ex. S8 [Ex. 25] at 2, 3, 7, 8.

47

1   defenses to Ms. Kenny's claims that may not be applicable to other class members, and the

2   "existence" of these unique defenses is enough to exert a "potential adverse impact on the class."

3   *Wagner*, 646 F. Supp. at 660-61.

4   **D.    Class Adjudication Would Neither Be Manageable, Superior to Individual Actions, Nor**
       **Consistent with PwC's Basic Due Process Rights.**

5       Additionally, a "class action would be unmanageable given the predominance of individual

6   issues necessary to establish [PwC's] liability for each of the putative class members." *Nguyen*, 2009

7   U.S. Dist. LEXIS 97524, at *28. "Because adjudication of claims on a classwide basis would amount

8   to the adjudication of each of the claims on an individual basis . . . the class action would be

9   unmanageable" and devolve into thousands of "mini-trials," so that PwC could be afforded its right to

10   show what job duties each associate actually performed in any given week. *Id.*; *Velazquez*, 2011 WL

11   4891027, at *8; *Soderstedt*, 197 Cal. App. 4th at 156; *see also Drake*, 2010 WL 2175819, at *8.

12       Without such unmanageable mini-trials, a class-wide trial based on only anecdotal testimony

13   from a handful of putative class members would deprive PwC of any real opportunity to establish its

14   exemption defenses to the misclassification claims of any of the absent class members. But "Rule 23

15   is not a one-way ratchet, empowering a judge to conform the law to the proof." *McLaughlin v. Am.*

16   *Tobacco Co.*, 522 F.3d 215, 220 (2d Cir. 2008), *partially abrogated on other grounds by Bridge* v.

17   *Phoenix Bond & Indem. Co.*, 553 U.S. 639, 642 (2008). The Rules Enabling Act "limits [such]

18   judicial inventiveness," *Amchem*, 521 U.S. at 620, and, by its plain terms, instructs that rules of

19   procedure "shall not abridge . . . or modify any substantive right." 28 U.S.C. § 2072(b). The

20   Supreme Court has thus unanimously "disapprove[d]" of the "novel project" of conducting a "Trial

21   by Formula" that would, as here, prevent defendants from "litigat[ing] [their] statutory defenses to

22   individual claims." *Wal-Mart*, 131 S. Ct. at 2561.

23       Such staggering manageability problems by themselves defeat certification, *In re Hotel*

24   *Telephone Charges*, 500 F.2d 86, 90 (9th Cir. 1974), particularly in light of Plaintiffs' failure to

25   submit a trial plan and their reliance on generic, boilerplate averments of manageability. Mot. at 28.

26   It is not enough to simply offer up the platitude that "there will not be any undue difficulty in

27   managing this litigation as a class action." *Id.* Rather, the "rule in the Ninth Circuit" is that the

28

1    plaintiff seeking class certification "bears the burden of presenting a workable trial plan." *Galvan v.*

2    *KDI Distrib.*, 2011 WL 5116585, at *12 n.10 (C.D. Cal. Oct. 25, 2011) (citing *Zinser*, 253 F.3d

3    at 1190). The trial plan is not "optional." *Id.* Rather, there is a "critical need" to determine how a

4    class action will actually be "tried" through a "full and clear articulation of the litigation's contours at

5    the time of class certification." *Wachtel*, 453 F.3d at 186 (quoting Fed. R. Civ. P. 23(c)(1)(A),

6    Advisory Comm. Note) (emphasis added); *accord, e.g., Evans*, 244 F.R.D. at 574 n.4. District courts

7    should thus "make it a usual practice to direct plaintiffs to present feasible trial plans, which should

8    include proposed jury instructions, as early as practicable when seeking class certification." *Vega v.*

9    *T-Mobile USA, Inc.*, 564 F.3d 1256, 1279 n.20 (11th Cir. 2009). Plaintiffs cannot fulfill their

10   obligation by offering a "mere[] proposal for the court to ponder." *In re Paxil Litig.*, 212 F.R.D. 539,

11   548 (C.D. Cal. 2003). "[I]n the Ninth Circuit, the presentation of a preliminary, unworkable trial plan

12   does not suffice for class certification." *Id.*[52]

13         A class action also is not the superior method of adjudication here because "putative class

14   members have sufficient monetary incentive to pursue their own claims," as they "are well-paid

15   employees who are seeking years' worth of overtime back-pay, penalties, and attorney fees. This

16   weighs heavily against class certification here . . . ." *Nguyen*, 2009 U.S. Dist. LEXIS 97524, at *28;

17   *accord Soderstedt*, 197 Cal. App. 4th at 156. Moreover, "the California Legislature has established a

18   procedure to streamline many of the claims asserted in Plaintiffs' complaint and on which Plaintiffs[]

19   attempt to base class certification." *Drake*, 2010 WL 2175819, at *9.[53]

20                              **IV.  CONCLUSION**

21         Plaintiffs cannot overcome the "veritable hotbed" of individualized inquiries concerning what

22   PwC associates actually do on a day-to-day and week-to-week basis by resurrecting the same kinds of

---

23

24

25   [52] Having omitted any trial plan from their Motion, Plaintiffs may not "sandbag[]" PwC by "submitting the plan in their Reply." *Sweet v. Pfizer, Inc.*, 232 F.R.D. 360, 369 (C.D. Cal. 2005);

26   *United States v. Uptergrove*, 2008 U.S. Dist. LEXIS 101952, at *18-19 (E.D. Cal. Dec. 17, 2008). As this Court has held, an argument "raised for the first time in reply" should be "disregard[ed]."

27   *Bledea v. Indymac Bank*, 2010 U.S. Dist. LEXIS 23391, at *35 n.9 (E.D. Cal. Feb. 25, 2010).

28   [53] *See also Garcia*, 2008 U.S. Dist. LEXIS 111969, at *13; *Lanzarone v. Guardsmark Holdings, Inc.*, 2006 WL 4393465, at *5 (C.D. Cal. Sept. 7, 2006).

categorical bars to exemption that the Ninth Circuit rejected. *Campbell*, 642 F.3d at 828. Nor can they obscure the extensive and varying discretion and independent judgment contemplated and encouraged by PwC's audit and supervisory policies, absent a speculative and impermissible "Trial by Formula" based on the idiosyncratic (and unreliable) experiences of a handful of plaintiffs. Plaintiffs' motion for certification of a putative state-wide class of unlicensed Senior Associates should therefore be denied.

DATED: January 13, 2012                    Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _____/s/ Daniel J. Thomasch_____
                Daniel J. Thomasch

Attorneys for Defendant
PRICEWATERHOUSECOOPERS LLP

Gibson, Dunn &
Crutcher LLP