IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SAMUEL BRANDON KRESS, et al.,

        Plaintiffs,                No. CIV S-08-0965 LKK GGH

      vs.

PRICE WATERHOUSE COOPERS,        <u>ORDER</u>

        Defendant.

_____/

        Previously pending on this court's law and motion calendar for August 16, 2012, was defendant's motion to compel depositions of 75 additional fact witnesses (opt-in class members and perhaps others), filed July 19, 2012.   Daniel Thomasch represented defendant. Peter Muhic appeared for plaintiffs.  After hearing oral argument and reviewing the joint statement, the court now issues the following order.

<u>BACKGROUND</u>

        This case involves a proposed nationwide class action concerning overtime compensation and other wages.  The discovery motion at issue seeks depositions of current or former PwC employees who have information concerning the work of Associates in the Attest division of the Assurance Line of Service or who have knowledge of the exemption status of these associates under the Fair Labor Standards Act ("FLSA").  PwC indicates that the number of opt-in plaintiffs in the class of unlicensed Attest Associates is 1,709.  PwC anticipates filing

1   motions to decertify the conditionally certified FLSA Attest Associate class.  There is no

2   discovery deadline; nor has the court set a schedule for the second stage collective action motion

3   practice.  (Jt. Stmt. at 12.)  Thus far, PwC has taken the ten depositions permitted under Fed. R.

4   Civ. P. 30(a)(2).  Five fact witnesses, consisting of named plaintiff[1] and class representative Le

5   and four others who had submitted declarations in support of the motion to certify, were deposed

6   in regard to the FLSA Attest Associate class; three fact witnesses, who had previously submitted

7   declarations in support of motion to certify, have been deposed in regard to the putative Attest

8   Senior Associate class; and two fact witnesses, named plaintiffs Kress and Kenny, have been

9   deposed in regard to both the FLSA Attest Associate class and the putative Attest Senior

10  Associate class.

11  DISCUSSION

12          *Scheduling/Case Management Conference*

13          PwC claims to need 75 more depositions to prepare for its motion to decertify the

14  class to show that the named plaintiffs are not similarly situated to the other employees they seek

15  to represent.  PwC seeks this many depositions to demonstrate how the work of different Attest

16  associates varies according to skill level, experience and initiative, industry sectors in which they

17  work, and staffing model employed on the various engagements.  For example, PwC will attempt

18  to show that the nature of the work on large and small audits is different, that audits of public

19  companies is different than audits of private companies and governmental bodies, and that the

20  work of those associates who have met PwC's reasonable performance expectations is different

21  from those associates who have not.

22          Plaintiffs, in resisting the taking of 75 depositions at this time, point out that PwC

23  has refused to disclose the identities, job titles and locations of these individuals, as well as failed

24  to provide a method for selecting the additional deponents or discuss the location and timing of

25  _____

26          [1]  There are fourteen named plaintiffs in this action.  (Dkt. no. 214.)

1  the depositions.  Furthermore, plaintiffs assert that any additional depositions should be part of a

2  broader case management order which should be issued by Judge Karlton after he addresses these

3  issues in a conference which results in an comprehensive schedule for the case.

4  Because the extent to which PwC's intentions to seek additional depositions after

5  this round, which may include current and former employees who were putative class members

6  but chose not to opt into the class, and other percipient witnesses who have direct knowledge of

7  the work performed by class members, as well as plaintiffs' concern that PwC may seek to

8  depose every single opt-in plaintiff prior to trial, and because the extent to which "class

9  decertification depositions" may overlap with the merits of the case (assuming that the class is

10  not decertified), the undersigned agrees that a case management conference and order may be

11  very helpful.  Such a schedule may be especially instructive in light of plaintiffs' suggestion that

12  PwC seeks to depose associates who may be class members in the Campbell case (California

13  plaintiffs), which would be in violation of Judge Karlton's orders prohibiting certain discovery

14  affecting Campbell class members.  If PwC succeeds, it could introduce this evidence in the

15  Campbell case even though it has been prohibited and discovery is closed in that case.

16  All of the above statements lead to the instruction to the party(ies) seeking a

17  scheduling/case management conference:  ask Judge Karlton and you might receive.  The

18  undersigned is not going to adjudicate in this discovery dispute, and for the trial judge, the

19  necessity of such a conference, nor will the undersigned ascertain whether a party initially

20  avoided the idea of such a conference, and now wants one, or the inference to be drawn from that

21  fact, if it is a fact.

22  *The Number of Depositions to Be Permitted*

23  Turning to PwC's request for 75 depositions, the determination of whether

24  unlicensed Attest Associates meet overtime exemptions requires an "intensely factual" analysis

25  of their actual job duties and responsibilities, at least initially. See  Campbell v.

26  /////

3

1   PricewaterhouseCoopers, LLP, 642 F.3d 820, 833 (9th Cir. 2011).[2]  However, the undersigned is

2   also cognizant that discovery, especially far-flung depositions, has the potential to be oppressive

3   to the point of wiping out the ability of one party or another to continue a litigation.  The issue

4   here involves drawing the proper balance and is determined by looking at other cases in similar

5   situations as well as the ability of the party seeking depositions to obtain substantially the same

6   ─────────────────

7   [2]A key issue in this litigation will be exactly what do attest associates do, and that is what
    the proposed discovery is supposed to ascertain/confirm.  The undersigned is not sure that the
    parties in this action have ever attempted to define the difference between auditing, assurance

8   and attest.  As the undersigned understands these terms, auditing is a broad umbrella term that
    includes the practices of assurance and attest.  Assurance and attest often do not involve verifying

9   the correctness of financial statements *per se* (pure number crunching applied to established
    standards and procedures), but may involve independent opinions on procedures and processes of

10  business/governmental entities (assurance), and the verification of information (an assertion)
    made by a third party (attest).  In simple terms an assurance may involve an opinion, for example,

11  on the best way for a certain entity to comply with Sarbanes/Oxley, Section 302 (disclosure
    controls) while an attest may involve verification that an assertion that one is in compliance with

12  that section of Sarbanes/Oxley is true.  See, e.g., *Financial Accounting Information &
    Resources*, financial-accounting-resources.blogspot.com/2010/03aicpa-and-institute-of-

13  internal.html, defining the difference between the terms.
            However, it is also probably true that not all accounting firms organize their business in

14  conformance with the undersigned's understanding, and opining to the correctness of a financial
    document may well meet a definition of "attest."  Previously in the related case, Judge Karlton

15  generally defined what PwC attest associates do:
             In essence, the Attest division performs audits. The audits seek to assure that a

16       company's financial statements are prepared in accordance with Generally
         Accepted Accounting Principles ("GAAP"), and are free of misstatements,

17       whether caused by error or fraud. See Overstreet Decl. ¶ 7. The ultimate recipient
         of PwC's audit work is the client company's Board of Directors, often through the

18       board's audit committee. These audits demonstrate clients' compliance with
         various regulatory mandates, and may also provide a necessary predicate for

19       access to investment capital.
                 In addition to verifying compliance, the Attest division provides some

20       advice to clients. The scope of this advice is limited by statutory and professional
         independence rules. These rules preclude PwC from performing management

21       functions for clients of the attest division, although PwC may "provide advice,
         research materials, and recommendations to assist the client's management in

22       performing its functions and making decisions."
    Campbell v. PwC, 602 F. Supp. 2d 1163, 1167 (E.D. Cal. 2009), rvsd (but not on this definition),

23  642 F.3d 820 (9th Cir. 2011).
            The undersigned, of course, does not make any rulings herein concerning the precise

24  scope of the attest associates duties – that is the function of the trial judge. However, PwC
    strongly argues that a sufficient sampling of "opt-in" class member depositions is necessary in

25  that the duties of attest associates are going to vary depending on the specific engagement.  If so,
    these duties may involve all aspects of "attest."  The issue in this motion is the amount of

26  discovery necessary to demonstrate this variety, and the sophistication of the varied work.

1    information from a collective source.

2            PwC's cited cases permit the type, and to some extent the number, of depositions

3    that are requested here in class actions where defendants were seeking discovery for the purpose

4    of class decertification.  In Williams v. Sprint/United Management Co., 2006 WL 1867471 (D.

5    Kan. Jun. 30, 2006), the court permitted further depositions to go forward (after 300 had been

6    taken) because plaintiffs did not contend that the opt-in plaintiffs to be deposed did not have

7    information concerning pattern and practice which was at issue there.  Although the court had

8    previously permitted the depositions of 300 opt-in plaintiffs, plaintiffs had not objected to that

9    previous ruling, and they did not currently object to the recently permitted depositions on the

10   basis that defendants had exceeded the number of depositions contemplated by the court and the

11   parties.  Id. at n. 1.  Rather, plaintiffs had objected to depositions of individuals not listed as

12   witnesses on this issue.  The court found that defendant could properly depose these individuals

13   because they were plaintiffs in the action seeking damages regarding pattern and practice issues.

14   Plaintiffs here attempt to distinguish the Williams case on this last point, it is actually similar in

15   some respects in that there has been no case management or other order limiting the number of

16   depositions in this case.

17           Other class action cases cited by PwC likewise allowed numerous depositions.

18   See Renfro v. Spartan Computer Services, Inc., 2008 WL 474253 (D. Kan. Feb. 19, 2008)

19   (permitting 27 depositions, and potential individualized discovery for all 100 opt-in plaintiffs)

20   because plaintiffs had failed to show undue burden with particularized facts and because each

21   plaintiff to be deposed had consented to participate in the lawsuit); Krueger v. N.Y. Tel. Co., 163

22   F.R.D. 446 (S.D.N.Y. 1995) (allowing 14 additional depositions in addition to the 19 depositions

23   to which plaintiffs had agreed).  The court distinguished that small number of class plaintiffs

24   (162) from other class actions involving thousands of absent class members scattered around the

25   country and perhaps unaware of the litigation.  In Ingersoll v. Royal & Sunalliance USA, Inc.,

26   2006 WL 2091097 (W.D. Wash. Jul. 25, 2006), the class consisted of 34 opt-in plaintiffs, "each

5

1   of whom has freely chosen to participate and each of whom has relevant information with respect

2   to the claims and defenses in this action." Id. at *3.  The discovery requested was necessary to

3   determine whether plaintiffs were "similarly situated within the meaning of the FLSA."  Id. at *2.

4   Individualized discovery as to all was permitted.

5   　　　　　　　On the other hand, cases cited by plaintiffs indicate that such discovery should be

6   limited to a random sampling, especially where the number of class members is in the thousands.

7   See Nelson v. American Standard, Inc., 2009 WL 4730166, *3 (E.D. Tex. Dec. 4, 2009) (citing

8   cases).[3]  Class actions, whatever their "opt in" or "opt out" characteristics, or whether pre-or post

9   certification, normally proceed in discovery on less than deposing the entire set of class

10  members.  See also Smith v. Lowes Home Centers Inc., 236 F.R.D. 354, 357-358 (S.D. Ohio

11  2006) (refusing to allow discovery directed to 1,500 "opt-in" class members):

12  　　　　　　　Other courts, however, have held that collective actions under the
    FLSA should be governed by the same standards as govern
13  　　　　　　　discovery in Rule 23 class actions and should be limited to only
    class wide and class based discovery. To permit individualized
14  　　　　　　　discovery, the reasoning goes, would undermine the purpose and
    utility of both class and collective actions. Adkins v. Mid-America
15  　　　　　　　Growers, Inc., supra, 141 F.R.D. 466. For example, some courts
    have limited discovery to only representative samples. See, e.g.,
16  　　　　　　　Bradford v. Bed Bath & Beyond, Inc., 184 F.Supp.2d 1342, 1344
    (N.D.Ga.2002)["[T]he parties were allowed to conduct discovery
17  　　　　　　　from 25 of the opt-in plaintiffs, including the named plaintiffs and
    six other opt-in plaintiffs chosen by defendant."]
18
19  　　　　　　　This Court agrees that limiting discovery to a statistically
    significant representative sampling, at this juncture, will both
20  　　　　　　　reasonably minimize the otherwise extraordinary burden imposed
    on the plaintiffs and their counsel [footnote omitted] and yet afford
21  　　　　　　　the defendant a reasonable opportunity to explore, discover and
    establish an evidentiary basis for its defenses. The Court will
22  　　　　　　　therefore limit the discovery appropriate to the de-certification and
    class certification proceedings to a statistically significant sample.
23  　　　　　　　However, if, after conducting the discovery of the representative
    sample, defendants can demonstrate to the Court that broader
24  　　　　　　　discovery is appropriate and necessary, the defendants can so
    move.

25

26  　　　　[3]  Discovery was limited to an agreed-upon 91 opt-in class members.  Although not clear,
    the discovery was written discovery as opposed to depositions.

6

1    Moreover, in response to the undersigned's question at hearing, defendant's

2    counsel affirmed that PwC supervisors, who had personal knowledge of what duties were being

3    performed by class members, had substantial information to impart on the nature of class

4    member job duties.  This information from a collective source has the potential to mitigate much

5    of the need for numerous depositions from the supervised class members.  See Pendlebury v.

6    Starbucks Coffee Co., 518 F. Supp.2d 1345, 1350-51 (S.D. Fla. 2007).  While "confirmation"

7    discovery of what will be testified-to by the supervisors is important, that confirmation can be

8    obtained with less than 75 further depositions.

9    Finally, while the undersigned is making no finding that PwC is seeking the 75

10   depositions as a means by which to bludgeon plaintiff's counsel financially, the fact remains that

11   taking this number of depositions at far-flung locales is bound to test the financial resources of

12   any plaintiff's counsel.

13   Therefore, PwC will be permitted only twenty-five more depositions for the time

14   being.  Defendants can move again before the undersigned if the necessary confirmation of its

15   supervisors' testimony cannot be obtained with the taking of twenty-five further depositions, and

16   the need for such is specifically demonstrated, i.e., something other than a general assertion.  The

17   court has attempted, as best it can, to balance the competing interests discussed above.  This

18   number of permitted depositions should be a useful sample which will have meaning.  And,

19   permitting twenty-five additional depositions for a class of 1,709 plaintiffs should not be unduly

20   burdensome at this point in the litigation.  This deposition number does not implicate concerns

21   pointed out by plaintiffs in their cited authority.  See Geer v. Challenge Financial Investors Corp.,

22   2007 WL 1341774, *3-4 (D.Kan. May 4, 2007) (248 depositions too many in light of burden and

23   expense).

24   CONCLUSION

25   Accordingly, IT IS ORDERED that:  PwC's motion for leave to take additional

26   depositions, filed July 19, 2012, (dkt. #292), is granted in part.  PwC is permitted to take twenty-

7

five opt-in class member or other person depositions, related to the class decertification issues. The logistics for such depositions was not at issue in the motion.  The parties shall use their best efforts to minimize the expense of these ordered depositions.

DATED: September 25, 2012

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

GGH:076/Kress0965.dsy5.wpd